**NORTHEASTERN PENNSYLVANIA IMAGING CENTER, Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 30, 2009.

Decided July 29, 2009.

Sharon R. Paxton and Randy L. Varner, Harrisburg, for petitioner.

Bart J. DeLuca, Jr., Sr. Deputy Attorney General, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Northeastern Pennsylvania Imaging Center (Northeastern) petitions for review of an adjudication of the Board of Finance and Revenue denying Northeastern's petition for a refund of Pennsylvania sales tax it paid for the acquisition and installation of an MRI system and a PET/CT Scan system.[1] Northeastern argues that the equipment was installed in connection with a construction contract and thereafter became a part of the real estate. Given these circumstances, Northeastern asserts that it was the obligation of its vendor to pay a use tax on the wholesale price of the equipment, and it was not Northeastern's obligation to pay a sales tax on the retail price of this equipment, as found by the Board. Concluding that Northeastern's position has merit, we reverse the Board.

### Background

For the most part, the facts relevant to this appeal were established by a joint stipulation of facts.[2] Northeastern paid sales tax on two separate acquisitions: the purchase of an MRI system and the purchase of a PET/CT Scan system from Phil-ips Medical Systems North American Company (Philips). In addition, Northeastern entered into agreements with Philips for the maintenance and servicing of the MRI and PET/CT Scan systems on which Northeastern also paid sales tax.[3] Northeastern seeks a refund of $362,811.88 plus interest.

With respect to the MRI system it purchased from Philips, Northeastern paid sales tax in the amount of $129,774.02. The sales agreement between Philips and Northeastern fixed the purchase price of $2,172,375, which covered the acquisition, transportation, installation, training, and one-year warranty on the MRI system. The MRI was installed in Northeastern's Imaging Center in December of 2003.

To prepare for the installation of the MRI system, in accordance with Philips' specifications, Northeastern made extensive structural changes to its building. These structural changes included revisions to the building's electrical, heating, ventilation and air conditioning, and plumbing systems.[4] Northeastern strengthened the floors and ceiling sup-

---

1. A magnetic resonance imaging (MRI) system is equipment used to identify disease and damage to soft tissue areas of the human body. STEDMAN'S MEDICAL DICTIONARY 876 (27th ed.2000). A positron emission tomography/computerized tomography (PET/CT Scan) system is equipment that uses radioactive substances administered to the patient to image anatomic information from a cross-sectional plane of the human body. *Id.* at 1842.

2. The Stipulations and Exhibits constitute the record of this case pursuant to Pennsylvania Rule of Appellate Procedure 1571(f), which provides that

   [n]o record shall be certified to the court by the Board of Finance and Revenue. After the filing of the petition for review, the parties shall take appropriate steps to prepare and file a stipulation of such facts as may be agreed to and to identify the issues of fact, if any, which remain to be tried.

PA. R.A.P. 1571(f).

3. Of the $135,027.86 sales tax paid on service agreements, $98,486.47 is for the MRI and $36,541.39 is for the PET/CT Scan system. Both service agreements include planned maintenance, as well as repairs and replacement services due to equipment malfunction.

4. A remote air conditioner and a remote chiller for the MRI were installed by Northeastern's HVAC contractor. The chiller was installed outside the Imaging Center and is connected to the MRI through pipes that pass through the walls of the Imaging Center. The MRI was installed in three rooms (collectively, the "MRI Rooms"): the room in which the magnet was installed (Magnet Room), an adjoining room containing power and control components and an adjoining room containing the computer equipment (Control Room).

ports, removing excess ferrous material; changed room sizes; and removed an outside wall in order to be able to move the MRI equipment into the building. The MRI magnet weighs 15,201 pounds and can only be moved by a crane. Troughs were installed in the walls and conduit above the ceilings of the MRI Rooms to accommodate the cables and wire needed to power and operate the MRI. Radio frequency shielding, consisting of zinc panels, had to be installed in the walls, floor and ceiling to prevent the radio signals of the MRI equipment from interfering with other devices. Finally, Northeastern installed a vent to allow for the safe removal of cryogenic helium vapor generated by the magnet.

After delivery of the MRI system to the Imaging Center, Philips personnel assembled, installed and connected the MRI system to the building's plumbing, cooling, and electrical systems. The installation of the MRI took approximately five days. The magnet and patient table were bolted to the building, using anchors installed in concrete beneath the floor of the Magnet Room.

The MRI remains in place at the Imaging Center. To remove the MRI magnet from the Imaging Center would require several days of construction work on the interior of the building. It would also require the removal of an exterior wall of the building to give a crane access to the magnet.

With respect to the PET/CT Scan system purchased from Philips, Northeastern paid sales tax in the amount of $98,010. The agreement between Philips and Northeastern fixed the total purchase price at $1,815,000. The agreement included acquisition of the PET/CT Scan system, together with its transportation, installation, training, and a one-year warranty. The PET/CT Scan system was installed in the Imaging Center on or about December 29, 2003.

Again, extensive preparations were undertaken to install the PET/CT Scan system at the Imaging Center. These included the installation of new electrical power; new heating, ventilation, and air conditioning systems; and installation of troughs and conduits in the walls and above the ceiling of the scanning and control rooms to accommodate the cables and wires needed to power and operate the PET/CT Scan system. Northeastern also enlarged rooms; installed lead panels to provide radiation shielding; enlarged doors to allow entry of the system into the building; and installed additional floor supports. The total weight of the PET/CT Scan system is 12,375 pounds, including the power equipment.

Philips spent approximately two weeks on the installation of the PET/CT Scan system. Two Philips engineers worked on the system each day. The gantries and patient table were bolted to the building using masonry anchors installed in concrete beneath the floor of the room. Various wires and cables were installed to connect the various components to the building's systems and to each other. The PET/CT Scan system is hardwired to the Imaging Center's electrical system.

The PET/CT Scan system remains in place at the Imaging Center. To remove the system would require several days of construction to dismantle and remove the PET/CT Scan components from the Imaging Center.

On December 7, 2006, Northeastern filed a claim with the Department of Revenue (Department), seeking a refund in the amount of $362,811.88 for the sales tax paid on the MRI and PET/CT Scan systems, as well as the sales tax paid on the service agreements for these systems. It

filed this request during a period of transition at the Department about how to tax such systems.

On July 20, 2004, the Department issued a letter ruling which stated that

prospectively the sale and installation of an MRI to [a] taxable entity is considered a construction contract. The MRI is considered to become a permanent part of the real estate upon installation.

Pennsylvania Sales and Use Tax Letter Ruling No. SUT–04–021, 7/20/2004, at 1. On May 20, 2005, the Department issued Letter Ruling No. SUT–05–008, rescinding Ruling No. SUT–04–021 and stating an installed MRI would be taxed as tangible personal property. Northeastern paid the sales tax on its systems in various installments between December 2003 and January 2005, while Letter Ruling No. SUT–04–021 was in effect; however, Northeastern requested its refund after that letter ruling was rescinded.

On April 26, 2007, the Department denied Northeastern's refund claim in its entirety. Northeastern then filed a petition for review of the Department's decision with the Board of Finance and Review, and it affirmed the Department's decision. Northeastern now petitions this Court for review of the Board's decision.

**Appeal Issues**

Northeastern seeks a reversal of the Board's decision.[5] It contends that the Department got it right in its 2004 letter ruling, in which it advised that the sale and installation of an MRI system triggers a use tax obligation by the seller, as opposed to a sales tax obligation by the purchaser. Northeastern argues that the Department's reasoning in the 2004 letter ruling should be resuscitated by this Court and that this Court should hold that Northeastern's acquisition of MRI and PET/CT Scan systems did not trigger a sales tax event.

Alternatively, Northeastern contends that the Department's denial of its refund claim violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Uniformity Clause of the Pennsylvania Constitution.[6] The Department granted refunds of tax to other taxpayers that paid sales tax on their MRI systems during the same period in which Northeastern paid sales tax on its MRI system. Refunds were granted between July 20, 2004, and May 20, 2005, to taxpayers who came forward before May 20, 2005. Taxpayers who delayed their refund requests until after May 20, 2005, such as Northeastern who made its refund request on December 7, 2006, were denied refunds.[7] Northeast-

---

5. The standard of review in appeals from the Board of Finance and Revenue is *de novo*. *Glenn Johnston, Inc. v. Commonwealth*, 712 A.2d 817, 819 n. 2 (Pa.Cmwlth.1998). Additionally, tax statutes must be strictly construed against the Commonwealth, and any reasonable doubt as to the application of the statute must be resolved in favor of the taxpayer. 1 Pa.C.S. § 1928(b)(3); *Plum Borough School District v. Commonwealth*, 860 A.2d 1155, 1157 n. 3 (Pa.Cmwlth.2004).

6. Article 8, Section 1 of the Pennsylvania Constitution provides:

All taxes shall be uniform, upon the same class of subjects, within the territorial limits

of the authority levying the tax, and shall be levied and collected under general laws. PA. CONST. art. VIII, § 1. In *Commonwealth v. Molycorp, Inc.*, 481 Pa. 208, 212, 392 A.2d 321, 323 (1978) (citations omitted), we stated that "[t]axpayer allegations of violations of the federal equal protection clause and the Pennsylvania uniform taxation clause are analyzed in the same manner."

7. Northeastern argues that the Department should have made the new policy effective for tax paid on or after May 20, 2005, because the determinative factor was not the date the refund determination was made but, rather, the date the sales tax was paid. A taxpayer must demonstrate "deliberate, purposeful dis-

ern asserts this disparate treatment of similarly situated taxpayers is unconstitutional.

In response to Northeastern's claim that the systems were installed as part of a construction contract, the Department counters that Northeastern, not Philips, was responsible for the construction needed to prepare Northeastern's building for the MRI and PET/CT Scan systems. It also argues that the systems are items of tangible personal property that were not so annexed to the building that they became real property structures.

With respect to Northeastern's constitutional claim, the Department denies that there was any deliberate and systematic discrimination. The Department explains that its change in policy was uniform and prospective. On May 5, 2005, the Department issued a public letter ruling which it placed on its website,[8] stating that the purchase or lease of an MRI was now considered to be a purchase of tangible personal property and would be subject to Pennsylvania sales tax. Accordingly, Northeastern's claim of systematic, unequal treatment of taxpayers is unfounded.

## Analysis

We begin with a review of the relevant sales and use tax principles. Section 202(a) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7202(a),[9] imposes a tax on the "sale at retail" of tangible personal property and certain services. A "construction contract," which is defined as a "contract or agreement for the construction, reconstruction, remodeling, renovation or repair of *real estate or a real estate structure,*" is not considered a sale of goods or services that will trigger the imposition of a sales tax. 72 P.S. § 7201(nn) (emphasis added).[10] Instead, the contractor pays a use tax on all tangible personal property ac-

---

crimination in the application of the tax … before constitutional safeguards are violated." *Molycorp,* 481 Pa. at 212, 392 A.2d at 323 (quotation omitted). Northeastern contends that the Department exercised selective enforcement of tax laws, which is deliberate, purposeful discrimination.

8. The Department states that a public letter ruling is "intended to provide interpretive guidance to the general public and does not bind the Department to any entity other than to the original Taxpayer." http://www.reven ue.state.pa.us/revenue/cwp/view.asp?a=23 & q=215435. *See also* 61 Pa.Code § 3.3(a)-(b). According to the Pennsylvania Code, there are two vehicles the Department may use to issue statements of policy: Revenue pronouncements and Revenue rulings. 61 Pa.Code § 3.2(a). Statements of policy are published as a separate part of Title 61 of the Pennsylvania Code and are issued under the authority of the Secretary, a Deputy Secretary or the Chief Counsel. 61 Pa.Code § 3.2(b). For example, the purpose of a "Revenue ruling" is to provide guidelines and interpretations by advising the public of the Department's application of the tax laws to a general factual situation. A Revenue ruling is issued when the Department believes that broad public dissemination is appropriate to ensure uniformity in the application of the law to a common factual situation. 61 Pa.Code § 3.2(a)(2).

9. Section 202(a) states:
There is hereby imposed upon each separate sale at retail of tangible personal property or services, as defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth as herein provided.
72 P.S. § 7202(a).

10. Section 201(nn) of the Tax Reform Code of 1971, states, in relevant part, as follows:
The following words, terms and phrases when used in this Article II shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning:
\* \* \*
A written or oral contract or agreement for the construction, reconstruction, remodeling, renovation or repair of real estate or a real estate structure.

quired by the contractor in the performance of a construction or services contract. 72 P.S. § 7201(*o*)(17).[11]

Whether a contract is truly for the construction or renovation of a "real estate structure" lends itself to differing interpretations. In an effort to provide some clarity on this point, the legislature amended the Tax Reform Code of 1971 to provide discrete examples of "real estate structures."[12] However, this amendment applies only to non-profit organizations. Northeastern is a for-profit corporation and, thus, Section 201(qq) of the Tax Reform Code of 1971 is not dispositive.

Precedent developed in other areas of law provides guidance on what constitutes a "real estate structure" for purposes of Section 202(a) of the Tax Reform Code of 1971.[13] In *In re Appeal of Sheetz*, 657

---

72   P.S. § 7201(nn).

**11.**   Section 201(*o*)(17) of the Tax Reform Code of 1971 defines "Use" as:

The obtaining by a construction contractor of tangible personal property or services provided to tangible personal property which will be used pursuant to a construction contract whether or not the tangible personal property or services are transferred.

72   P.S. § 7201(*o*)(17).   A regulation adopted by the Department provides that the

[i]mposition of tax on construction activities shall conform with the following:

(1) A contractor shall pay tax upon the purchase price, as defined by the [Tax Reform Code of 1971], of all property, including materials, equipment, components and supplies, which he furnishes and installs in the performance of his construction activities. Example 1: As part of a contract for the construction of a house "X" Contractor has agreed to install a built-in dishwasher for his customer. "X" Contractor pays his supplier $150 for the purchase of the dishwasher. "X" Contractor pays $9 sales tax to his supplier and subsequently installs the dishwasher in the kitchen of the house he is building. The dishwasher becomes a part of the realty and is included in the overall price of the house to the customer. "X" Contractor does not charge sales tax on this transaction to his customer. The contractor may include the tax he must pay in his bid proposal but not as a separately stated item.

61   Pa.Code § 31.12(a)(1).

**12.**   Section 201(qq) of the Tax Reform Code of 1971 defines "real estate structure" as follows:

A structure or item purchased by a construction contractor pursuant to a construction contract with:

(1) a charitable organization, a volunteer firemen's organization, a nonprofit educational institution or a religious organization for religious purposes and which qualifies as an institution of purely public charity under the act of November 26, 1997 (P.L. 508, No. 55), known as the "Institutions of Purely Public Charity Act";

(2) the United States; or

(3) the Commonwealth, its instrumentalities or political subdivisions.

The term includes building machinery and equipment; developed or undeveloped land; streets; roads; highways; parking lots; stadiums and stadium seating; recreational courts; sidewalks; foundations; structural supports; walls; floors; ceilings; roofs; doors; canopies; millwork; elevators; windows and external window coverings; outdoor advertising boards or signs; airport runways; bridges; dams; dikes; traffic control devices, including traffic signs; satellite dishes; antennas; guardrail posts; pipes; fittings; pipe supports and hangers; valves; underground tanks; wire; conduit; receptacle and junction boxes; insulation; ductwork and coverings thereof; and any structure or item similar to any of the foregoing, whether or not the structure or item constitutes a fixture or is affixed to the real estate, or whether or not damage would be done to the structure or item or its surroundings upon removal.

72   P.S. § 7201(qq).

**13.**   The parties agree that *Commonwealth v. Beck Electric Construction, Inc.*, 485 Pa. 604, 403 A.2d 553 (1979), does not provide meaningful guidance here even though it is a sales tax case. *Beck Electric* was partially superseded by the Act of April 23, 1998, P.L. 239, No. 45 (Act 45 of 1998), insofar as it pertained to the application of the sales and use

A.2d 1011 (Pa.Cmwlth.1995), a real estate assessment case, this Court considered the question of whether chattel property that becomes affixed to real estate should be considered in calculating the property's real property assessment. The parties agree that the principles established in *Sheetz* are appropriate to apply here, even though they disagree on the conclusion to be reached by their application.

In *Sheetz,* we identified three classes of chattels and whether they constitute personalty or realty. In the first class of chattels are furniture and similar items, and they are always personalty. In the second class of chattels are items annexed to the building or land to the extent that they cannot be removed without causing injury to the real property, such as roof shingles, and they are always realty. In the third class of chattels are items that are affixed but can be removed without injury to the chattel or to the real property. Items in the third class of chattels may be either realty or personalty, depending upon the circumstances.

At issue in *Sheetz* was whether the canopies placed over the gasoline pumps at a Sheetz service station became part of the real estate for purposes of assessing the value of the property. We concluded that the canopies were items falling into the third class of chattels, *i.e.,* either personalty or realty. We concluded that the canopies were realty, using the following three-part test: (1) the canopies were affixed to the land; (2) the canopies were essential to the use of the property as a gas station; and (3) the canopies were intended to be permanent.

Subsequently, this Court clarified the *Sheetz* holding in *Shenandoah Mobile Company v. Dauphin County Board of Assessment Appeals,* 869 A.2d 562 (Pa. Cmwlth.2005). We held that a communications tower was taxable as "real estate" even though the tower was erected on leased land and had to be removed upon termination of the lease.

The communications tower was found to fall within the third class of chattels identified in *Sheetz.* In resolving the question of whether the tower was "essential to the permanent use" of the improvement, we observed "that the degree of attachment necessary to evidence permanence is not high, and can include the bolting of a fixture to the realty." *Id.* at 568. Importantly, this Court determined that the tower was "essential to the permanent use" of the improvements on the property because "the concrete pad was installed solely to support the Tower and without the Tower the concrete pad serves no function." *Id.* at 568–569.

With respect to its MRI system, Northeastern asserts that its equipment is so annexed to its building that it falls into the second class of chattels identified in *Sheetz, i.e.,* those that are always realty. It argues that because a hole must be cut in an exterior brick wall to remove the MRI system, the MRI system must constitute real estate. The Department responds that the MRI system falls into the third class of chattels identified in *Sheetz* requiring, *inter alia,* an inquiry into the three factors applied to the gas station canopies. Based on precedent on the question of what constitutes "annexation" for purposes of the second class of chattels identified in *Sheetz,* we agree with the Department.

In *Christ v. Prater Industries, Inc.,* 67 F.Supp.2d 491, 494–495 (E.D.Pa.1999), the District Court considered whether a grass

tax to tax-exempt entities like the Commonwealth. In *Beck Electric,* the Court held that ease of portability of the equipment determined whether an item was realty. However, this analysis was based upon a regulation that has since been superseded.

seed mixer that stood approximately thirteen to fifteen feet tall, weighed approximately three-quarters of a ton, and was bolted into the plant foundation was personalty or realty. The District Court concluded it was personalty, not realty. The District Court arrived at this conclusion using the *Sheetz* test for the third class of chattels. Nevertheless, the Court focused on annexation, observing that the extent of integration into the real estate is critical and that the size of the equipment is not determinative. We find this "extent of annexation" analysis persuasive.

In *Clayton v. Lienhard*, 312 Pa. 433, 167 A. 321 (1933), our Supreme Court considered whether an automatic sprinkler system was an "annexation" and, thus, fell into the second class of chattels identified in *Sheetz*. The Supreme Court concluded that the sprinkler system fell into the second class of chattels. It reasoned as follows:

> The sprinkler system in the instant case must, we think, be considered as falling within the second class above described-a part of the realty for all purposes. It was installed in the original construction of the building; it was a permanent improvement which would pass upon a sale of the freehold; it was affixed so that it could not be removed without material injury to the building and damage to itself. By these criteria, the apparatus *became realty as an integral part of the building.*

*Id.* at 437, 167 A. at 322 (emphasis added).

Finally, in *Catanzaro v. Wasco Products, Inc.*, 339 Pa.Super. 481, 489 A.2d 262, 265 (1985), the Superior Court considered whether a skydome or skylight was "so annexed" to a school building as to constitute chattel that is always realty. The Court compared the skylight to a window, which was plainly part of the realty of the building. It noted that the skylight was so integrated into the building that its detachment would cause material injury to the building. Accordingly, it concluded that skylights constituted realty.

Northeastern's MRI system does not fall into the second class of chattels, such as a skylight or an automatic sprinkler system, that are always realty. The MRI system was not installed in the original construction of the building; is not a permanent improvement that remains with the building upon its sale; and is not so affixed that its detachment from the building will damage the building and the magnet. There is a difference between damaging a building and merely making structural changes to a building in order to remove a large item of tangible property.[14] Size alone cannot render chattel property realty. Were this the case, a piano would become realty if a window or door had to be enlarged or a crane used in the piano's installation or removal. It would be a silly, and indeed absurd, legal outcome for a piano to be considered realty.

■ In short, we agree with the Department that Northeastern's MRI system has not been so "annexed" to the building that

---

14. Northeastern fails to appreciate that the damage must be caused by the actual detachment of the system from the building. Neither the building nor the MRI system itself will be materially harmed by detaching the system from the building and preparing it for removal. The physical damages to the building will result from the need to create a larger opening through which the MRI system can be removed. Under Northeastern's view, size will be the deciding factor in whether a chattel constitutes real estate. The need to create an opening for the removal of a large appliance or piece of furniture is an accommodation, not damage. By contrast, a sprinkler system cannot be removed without damaging the building in a way that makes the building unusable.

it falls within the second class of chattels identified in *Sheetz*. This means that we must review both systems under the test developed for the third class of chattels, those that may be either personalty or realty, depending on the circumstances.[15]

In *Sheetz*, this Court used three factors to determine whether a chattel within the third class is so affixed that it becomes part of the real estate, and we apply these factors here. Accordingly, we must consider: the manner of physical attachment or installation of the systems; the extent to which the systems are essential to the use of the building; and whether the systems were intended to be permanent.

With respect to the first factor, the Department minimizes the extent of the annexation of the equipment to the building. The Department reduces the installation to one of mere bolts and wire connections. This is an incomplete description and an unpersuasive argument.

Over a period of five days, Philips personnel connected the MRI system to the building's plumbing, cooling, and electrical systems. Components of the MRI and PET/CT Scan systems have been bolted into the concrete sub-floor; hardwired into the electrical system; and connected by inter-wall cables and wires. Additionally, the MRI system is connected to a remote chiller installed outside the Imaging Center through pipes that pass through the walls of the Imaging Center. These systems, as did the canopies in *Sheetz* and the tower in *Shenandoah Mobile*, possess the requisite degree of "attachment;"[16] we conclude that the equipment has been attached.

■ With respect to the second factor, the Department argues that the systems are not essential for the occupancy of the building but only for the building's use as an imaging center. The Department places too narrow a construction on this second *Sheetz* factor.[17] It is the owner's chosen use of the property that determines whether it is essential. In both *Sheetz* and *Shenandoah Mobile*, this Court held that the items in question were part of the realty because they were essential to the use of real estate *for the particular purpose* chosen by the owner or lessor of the land. In *Sheetz*, the Court found that the canopies were necessary for the use of the property as a modern gasoline station with self-service pumps. In *Shenandoah Mobile*, the Court conceded that the tower was not essential to the use of the land. However, the concrete pad was installed on the land solely to support the tower, and the concrete pad served no function without the tower; the tower, together with the concrete pad, was held to be essential to the chosen use of the land for placement of a cellular telephone tower.

---

15. In *Sheetz*, the canopies were installed by Sheetz not the vendor. Accordingly, it does not matter that Northeastern did the construction in preparation for the MRI and PET/CT Scan systems. The real point is that the systems could not be installed without construction that was rather extensive.

16. In *Sheetz*, the canopies were mounted on pillars attached to the ground by bolts sunk in poured concrete foundations which, in turn, were also covered with concrete. The communications tower in *Shenandoah Mobile* was attached to the property by four eight-foot-long bolts that were imbedded deep in the concrete base, which was an in-ground foundation.

17. The Department's argument is also inconsistent with the Department's regulation at 61 Pa.Code § 31.11, where such items as laboratory tables, restaurant bun steamers, and refrigerated display coolers are presumed to become part of the real estate, even though these items are not necessary for other uses of the premises.

Northeastern has made significant improvements to its building, including reinforcement of the sub-floors; installation of conduit and troughs in the walls and conduit above the ceilings; installation of a remote air conditioner and chiller; revisions to the plumbing system; installation of radio frequency shields in the walls, floor, and ceiling; creation of a cryogenic vent; and the alteration of room dimensions and openings. These numerous and specialized structural, electrical, and mechanical improvements to the Imaging Center would serve no function without the systems themselves. Accordingly, we conclude that the MRI and PET/CT Scan systems are essential to the ongoing use of the property as an Imaging Center.

■ With respect to the third factor, the Department argues that the equipment is not permanently installed because it is removable and can be replaced with new equipment. However, intention, as explained in *Sheetz*, is measured by objective criteria and "permanent" is not to be construed literally. We stated that

> [t]he permanence required is not equated with perpetuity. Just because they have been and can be moved does not mean the intention was not to make them permanent. *It is sufficient if the item is intended to remain where affixed until worn out,* until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose.

*Sheetz*, 657 A.2d at 1014 (quotation omitted) (emphasis added).

The MRI and PET/CT Scan systems were installed with the intention that they remain there so long as the building continues to be used by Northeastern as an imaging center or until the systems must be replaced because they have become obsolete. The systems have been in the building for five years, and Northeastern does not intend to replace them until either the age of the equipment or advancements in medical technology necessitate their replacement. Given these facts, Northeastern has shown, objectively, an intention that the systems become a permanent part of the real estate.[18]

Thus, we hold that the MRI and PET/CT Scan systems are "real estate structures" within the meaning of Section 201(nn) of the Tax Reform Code of 1971. Each system satisfies the three factors established in *Sheetz* for chattel that could be either personalty or realty. Northeastern's evidence supports the conclusion that the chattels in this case, the MRI and

---

18. The dissent contends that the parties did not stipulate that Northeastern's equipment would remain in place so long as the building was used as an imaging center and the equipment did not wear out or become obsolete. The parties stipulated that the systems were "essential parts of an imaging center," which means that the equipment would have to be there so long as the building was used as an imaging center. Supplemental Stipulation of Facts, No. 28. The parties stipulated that Northeastern "presently" has no plans to replace the systems because Northeastern has no way of knowing when replacement will become necessary. Further, the Commonwealth did not argue that Northeastern might replace the systems before they wore out or became obsolete. Rather, the Commonwealth argued that to be "permanent," the equipment under review has to be essential to anyone's use of the building for any purpose as, for example, an air-conditioning system. However, this was not the *Sheetz* holding.

The dissent's statement that leasing this equipment is becoming the norm is not derived from the parties' stipulation. It comes from the Department's Letter Ruling No. SUT–05–008, rescinding Letter Ruling No. SUT–04–021. As such, the statement represents the Department's belief, but it is not a fact in evidence.

PET/CT Scan systems, constituted realty, not personalty.[19]

## Conclusion

Because Northeastern met its burden of proving that its MRI and PET/CT Scan systems are "real estate structures" in accordance with the standards in *Sheetz* for the third class of chattels, we will reverse the Board's denial of Northeastern's petition for refund of sales tax.

## ORDER

AND NOW, this 29th day of July, 2009, the order of the Board of Finance and Revenue in the above-captioned matter, dated September 18, 2007, is hereby REVERSED. The Chief Clerk is directed to enter this order as final unless exceptions are filed within 30 days of this order pursuant to PA. R.A.P. 1571(i).

## DISSENTING OPINION BY Senior Judge McCLOSKEY.

I respectfully dissent as I disagree with the conclusions reached by the majority in this case. I begin by noting that this is a finance and revenue matter subject to de novo review by this Court.[1] The record in this case consists solely of a partial and a supplemental stipulation of fact, along with attached exhibits, submitted by the parties.

Upon review of these stipulations, the majority concludes that Northeastern Pennsylvania Imaging Center (Northeastern) has objectively shown an intention that the MRI and PET/CT systems become part of their real estate. The major-

ity also concludes that the MRI and PET/CT systems were intended to remain in place as long as the building continued to be used as an imaging center, until the systems become obsolete or until either the age of the equipment or advancements in medical technology necessitate their replacement. I believe that these conclusions are overbroad and do not accurately reflect the facts as stipulated to by the parties.

In the stipulations, the parties simply noted that "[i]n some cases, MRIs and PET/CT scanners are relocated and reused. An MRI or PET/CT scanner would generally be refurbished before reuse and recalibration would be required ... An MRI or PET/CT scanner may be replaced for several reasons, including, among others, the placement of a new or more technically proficient model...." (Supplemental Stipulation of Facts, Paragraph 28, p. 5). Additionally, the parties indicated in the stipulations that they "presently" had no plans to replace the MRI or PET/CT systems. (Partial Stipulation of Facts, Paragraph 15, p. 5; Supplemental Stipulation of Facts, Paragraph 45, p. 10).

Based upon the above stipulated facts, I simply cannot accept the conclusion reached by the majority that at the time the MRI and PET/CT systems were placed in the building, Northeastern intended that these systems be a permanent part of said building. Moreover, the rapid advancement in medical technology fights against the majority's conclusion. In fact, leasing of this type of equipment is becom-

---

19. Because we decide this case on the merits, we need not address Northeastern's constitutional arguments.

1. Although this Court hears appeals from the Board of Finance and Revenue in our appellate jurisdiction, this Court functions essentially as a trial court. *Concentric Network*

*Corporation v. Commonwealth*, 897 A.2d 6 (Pa.Cmwlth.2006), *affirmed*, 592 Pa. 26, 922 A.2d 883 (2007). A stipulation of facts is binding and conclusive upon the Court, but we may draw our own legal conclusions from those facts. *Id.*

ing the norm because of the need to remain current with the technology.

For these reasons, I would affirm the order of the Board of Finance and Revenue.