[No. 29735. Department Two. August 21, 1946.]

WILLIAM STRAIN et al., *Appellants*, v. JACOB GREEN et al., *Respondents*.[1]

'Reported in 172 P. (2d) 216.

*Charles L. Hamley* and *Nelson R. Anderson,* for appellants.

*N. A. Pearson,* for respondents.

ROBINSON, J.—On August 7, 1943, Jacob Green agreed to sell to William Strain his waterfront home on Mercer Island for thirty-five thousand dollars, "Payable as follows: Cash on delivery of sufficient Warranty Deed and evidence of clear title." It was, however, provided in the earnest money receipt that the "Greens are to have 60 days time to move out of the house." On August 20, 1943, Green and wife executed a statutory warranty deed to Strain and wife, which they duly acknowledged and delivered to the purchasers on August 27th, receiving the purchase price in full. At some time thereafter, they left the premises, taking with them, from the basement, the hot water tank and enclosed electric heater, the venetian blinds from the windows, certain lighting fixtures, and three mirrors, two of which were rather firmly attached to the walls. It was also claimed, in the ensuing lawsuit, that they unlawfully carried away a fireplace screen, a tool house, and certain chicken wire, with the posts which supported it. The total value of the articles removed was alleged to be $1,105.

On November 8, 1943, Mr. Hamley, as attorney for the Strains, demanded, in writing, that all of said property be returned to the premises. No part of the demand being complied with, this action was brought in March, 1944. The plaintiffs prayed for a judgment requiring the defendants to return the property, or, in case that that could not be done, for $1,105, and additional sums alleged to have been necessarily expended by the plaintiffs on account of the removal from the property, or which they would be required to expend to reinstall it.

It appears from the evidence that, when the defendants purchased the home, they found the hot water system inadequate and put in a large, modern insulated tank, with an

automatic electric control. When they left the house, they disconnected that tank from the plumbing and electric system and reconnected the much smaller tank which was serving the house when they bought it. This the plaintiffs found wholly inadequate and supplemented it, as far as, in view of wartime scarcities, they were able to do so, by buying and hooking up two large tanks and making certain other additions.

When the plaintiffs agreed to buy the house, and up until they had completed the payment on the purchase price, there was a large and beautiful crystal chandelier in the center of the dining room ceiling, and five other matching fixtures in that room and adjoining rooms. The distinctive feature of these articles was their ornamentation by a great number of pendants of imported crystal glass. These fixtures the Greens also disconnected and took with them. Before departing, however, they bought and installed, in place of the fixtures removed, some highly inferior plastic imitations.

When the plaintiffs purchased the house, there was a large plate glass mirror on one of the dining room walls. It had been installed in the following manner: A large piece of three-eighths-inch plywood was firmly nailed to the plastered wall, and the mirror was attached to this backing by screws. The mirror itself was, of course, readily removed. The Greens removed it and left the plastered wall with the large square of plywood in the middle of it. The mirror having been removed, the plywood had no visible excuse for being there, and the Strains removed it. It still had twenty-six nails in it when introduced in evidence, and holes where there had been a dozen or so more. When the plywood was pried from the wall, each nail brought some of the plaster with it. The mirror over the living room fireplace was attached to the wall in the same manner, although fewer nails were used. This mirror the Greens also removed. The mirror in what was known as the powder room also had a plywood backing, but there is no very convincing testimony that the plywood was nailed, or attached, to the wall, and Mrs. Green's testimony was to the effect

that the mirror merely rested upon a table and was held in place by a wire which ran to a hook above it, just as pictures are hung.

As for the other articles, the venetian blinds were of odd sizes, cut and built especially for the windows of the house. The so-called tool house turned out to be a child's playhouse, and there was no evidence that chicken wire was ever taken from the premises.

The trial court held that the automatic hot water tank was a fixture, and must be returned. The venetian blinds were also held to be fixtures, and ordered returned. Certain damages were awarded with respect to reinstallations. As the defendants have not cross-appealed, we are not concerned with that portion of the judgment. The court, however, held that the light fixtures and mirrors were personal property, which the defendants had a right to remove, and it is from that holding that this appeal is taken.

We will not undertake to write a treatise on the law of fixtures. Every lawyer knows that cases can be found in this field that will support any position that the facts of his particular case require him to take. As early as 1899, the court said, in *Philadelphia Mtg. & Trust Co. v. Miller,* 20 Wash. 607, 56 Pac. 382, 72 Am. St. 138, 44 L.R.A. 559:

"There is a wilderness of authority on this question of fixtures . . . cases . . . are so conflicting that it would be profitless to undertake to review or harmonize them."

Throughout the trial, the trial judge repeatedly referred to that case as "the *Miller* case," and counsel, in his opening brief, refers to it as "the leading case in this jurisdiction." It held that four mantels, a bathtub, and a hot water heater connected with the plumbing were not fixtures. Since much reliance is placed upon that decision, we will quote rather freely from the opinion:

"Anciently, mantels were uniformly built as a part of the house, and therefore became a fixture to the realty. . . . But advancing mechanical science and taste have evolved an altogether differently constructed mantel, and mantels such as are described by the testimony in this case are now

constructed without reference to any particular house or particular fireplace. They are what are called 'stock' mantels, and are sold separately and made adaptive to any kind of a house. They are, in fact, as much a separate article of merchandise as a bedstead or a table. . . . The same advancement has been made in bath tubs. The old-fashioned bath tub, that was sealed in and actually made a part of the bath room, has largely given place to the more convenient bath tub, that rests upon legs and can be attached to any heating system that happens to prevail in the house where it is used. And so with heaters or boilers. In this instance the boiler is in no way attached to the building, excepting by its plumbing connections. It could be detached without in any way injuring the realty; . . . The testimony shows that the building back of the mantels, or that portion of it which was concealed by the mantels, was plastered and kalsomined; that for about three years the mantels were not fastened to the wall in any way, but supported themselves in the position they occupied, and that, after that time, they were fastened to the wall by screws to render them more stable and keep them from toppling. The boiler and bath tub were not placed in the building for several years after the mortgage was given."

It would seem that the court could not very well have held otherwise than it did, without encroaching upon the province of the jury; for it is further said:

"The question of whether or not the particular piece of furniture or machinery is a chattel or fixture has been held by a majority of the courts to be a mixed question of law and fact. In this case the court instructed the jury. These instructions were not excepted to and must be presumed to have correctly stated the law; and, the jury having found the facts in favor of the respondent, we would be loth to disturb their findings, unless we were compelled to say that, as a matter of law, the property sued for was a part of the realty."

Respondents also strongly rely on *Hall v. Law Guarantee & Trust Society*, 22 Wash. 305, 60 Pac. 643, 79 Am. St. 935. The first headnote to this case reads as follows:

"Gas and electric light fixtures and globes, a windmill, a hot water tank, curtains, window and door screens, when attached to a house, are not fixtures as between a mortgagor and a mortgagee."

Referring to these two cases, the first of which was decided in 1899, and the second in 1900, respondents say, in their brief, that they "have never been overruled in this state and are the law today." Although they may never have been expressly overruled, they at least have been outmoded. We think it highly improbable that it would now be held, even in a case between a mortgagor and a mortgagee, that a mantel, or a bathtub, or an electric hot water heater connected with both the plumbing and the electrical system, is not a fixture. The law relating to fixtures has slowly and gradually changed as times have changed. Various household appliances, not formerly held to be fixtures, have become so in this "built-in" era. But the major changes are probably the result of an awareness of the fact that the luxuries of a given generation become the necessities of the next. It seems highly improbable that any present-day court would hold that a foreclosed mortgagor, on surrendering the premises, could lawfully disconnect, and take with him, the household bathtub.

We think the court had in mind the two cases just discussed and, perhaps, some others of like tenor, when it said, in *Hall v. Dare*, 142 Wash. 222, 252 Pac. 926, 50 A.L.R. 635, a case in which it was held that a flag pole, which could be removed without breaking any fastenings, was a fixture, that:

"Some of the early decisions of this court, when superficially read, may seem not wholly in harmony with our conclusions here reached, but we know of no expression of views by this court made since rendering our decision in *Filley v. Christopher, supra* [39 Wash. 22, 80 Pac. 834], to be other than consistent with the conclusion we here reach, which is that the pole became, by the manner and circumstances of its erection by the owner, a fixture and part of the realty, and hence passed to the defendant by the mortgage foreclosure and the deed from Mrs. Huber."

In the instant case, the appellants state that the following questions are involved:

"1. Do electric light equipment and chandeliers become fixtures upon being attached in the usual manner to the walls and ceiling of a dwelling by the owner in possession?

"2. Do large ornamental mirrors mounted on plywood backing become fixtures upon being attached to the walls of a dwelling by the owner in possession thereof?"

The respondents' statement of the questions involved accurately indicates the theory upon which the trial court held the light fixtures and mirrors were rightfully removed. They read as follows:

"1. Should a chandelier and sidelights that have belonged to a family for thirteen years and have been moved with the family from house to house four times become fixtures in the last house when the family had no intention of making them such?

"2. Should mirrors that belonged to a family for fifteen years and had been moved from house to house become fixtures in the last of the four houses when the family had no intentions of making them such?"

As indicated by the questions propounded by the defendants, both Mr. and Mrs. Green categorically testified that they never had any intention that the chandelier, sidelights, and mirrors should ever become fixtures, and that they had removed them, as personal property, from the former houses in which they had lived. Furthermore, their testimony was in no way rebutted.

We do not wish it to be understood that we in any way question the veracity of the respondents, but we are here considering an alleged rule that may be involved in future cases; and, treating the matter wholly impersonally, if a witness testifies that, when he put a chandelier in a house, he intended to take it out if he should ever sell the house, in what possible way can his evidence be disputed? And, passing that, by what *ex post facto* system of mind reading could a purchaser determine the vendor's state of mind when he installed the chandelier? There is no evidence whatever in the instant case that the respondents told the appellants that they had ever had such an intention until after the appellants had bought, and paid for, the house. If it be held in this case that the secret intention of the defendants is determinative of the question whether or not the articles involved are fixtures, that holding will en-

courage and invite persons less honest than the respondents to attempt to remove from premises sold every at-all-movable article that can be disconnected without breakage.

 It has never been the law of this jurisdiction, nor, we think, of any other, that the secret intention of the owner who affixed the disputed article, of itself, determines whether or not it was a fixture or a mere personal chattel.

Speaking of *Ballard v. Alaska Theatre Co.*, 93 Wash. 655, 161 Pac. 478, the respondents say, in their brief:

"As the case says: 'Where the intent is discovered it is generally controlling.' We agree with this; the only evidence of intent in this case is the testimony and the actions of Mr. and Mrs. Green and they testified that their intention was never to part with the personalty they placed there: the chandelier, sidelights and the mirrors."

We would be unwilling to characterize the opinion in that case as the leading case in this jurisdiction, but it states certain propositions which are still the law of this state, and some of them have been so almost from the beginning. We quote from the opinion:

"The intent is not to be gathered from testimony of the actual state of the mind of the party making the annexation (*Washington Nat. Bank v. Smith*, 15 Wash. 160, 45 Pac. 736); but is to be inferred, when not determined by an express agreement, from the nature of the article affixed, the relation and situation to the freehold of the party making the annexation, the manner of the annexation, and the purpose for which it is made."

The case cited in the above quotation was decided fifty years ago, in 1896. Turning to the opinion in the case, we find the following statement on page 169:

"That the intention with which machinery is placed upon the real estate is one of the elements to be taken into consideration in determining whether or not it remains a chattel or becomes a part of such real estate is conceded, *but it does not follow that such intention can be shown by testimony as to the actual state of the mind of the person who attached the machinery to the real estate at the time it was attached. On the contrary his intention must be gathered from circumstances surrounding the transaction and from what was said and done at the time, and cannot*

*be affected by his state of mind retained as a secret."* (Italics ours.)

■ It is also said, in *Ballard v. Alaska Theatre Co., supra*:

"When the annexation is made by a tenant or licensor the presumption is that he did not intend to enrich the freehold, but intended to reserve title to the chattel annexed in himself, while from an annexation by the owner of the property, the presumption is the other way. [Citing cases.]

"It therefore often happens that the same character of article annexed to the realty in the same way will be held to be a trade fixture and removable when annexed by a tenant, but real property and not removable when annexed by the owner of the property."

The opinion in *Hall v. Dare, supra,* by reference, approves the rule laid down in *Filley v. Christopher,* 39 Wash. 22, 80 Pac. 834, 109 Am. St. 853, in which it is said:

"The true criterion of a fixture is the united application of these requisites: (1) Actual annexation to the realty, or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; and (3) the intention of the party making the annexation to make a permanent accession to the freehold."

Respondents in this case were owners when they installed the articles in question. The presumption, then, is (as held in the last of the quotations hitherto made from *Ballard v. Alaska Theatre Co., supra*) that it was their intention to enrich the freehold. This presumption is not overcome by evidence of secret intention, as is shown by the first of the quotations hitherto made from the same case, and then more plainly by the other quotation to the same effect from *Washington Nat. Bank v. Smith, supra.* Nor is the fact that the respondents successfully removed the articles from house to house of much, if any, probative value.

■ The chandelier and sidelights were actually annexed to the realty, and, clearly, for the use or purpose of that part of the realty (the house) with which they were connected. Their purpose, of course, was to make it livable. The fact that such articles are universally called "light fixtures" is, though not determinative, some evidence that they are

fixtures. The fact that, after removing the chandelier and sidelights, the respondents replaced them with others amounts to an implied admission on their part that a house without light fixtures would not be a complete house. In our opinion, the chandelier and sidelights were fixtures in law and in fact.

■ The mirrors—at least two of them—present a much closer question. We are satisfied that there is no adequate proof that the powder room mirror was physically annexed to the realty, and as to that mirror, which seems to have been the most valuable of the three, we need not inquire further. It was not a fixture. The others present a unique situation. Each of them could be taken down from the respective walls by removing a few screws, but in each case that would leave on the wall a large square of plywood which could not be removed, in the one case, without damaging the plaster, and, in the other, without leaving some damage by nail holes, and a portion of the wall, of a different shade. We have arrived at the opinion that each of these mirrors and its plywood backing should be regarded as one article, and that in each case that article should be regarded as having been a portion of the house walls, and that, as such, they went with the house to the purchasers by the warranty deed, which contained no reservations whatsoever.

Except as to the powder room mirror, the judgment, in so far as appealed from, is reversed, and the cause remanded to the trial court for the entry of judgment in accordance herewith.

BEALS, C. J., BLAKE, and JEFFERS, JJ., concur.