35 A.3d 752

NORTHEASTERN PENNSYLVANIA
IMAGING CENTER, Appellee

v.

COMMONWEALTH of Pennsylvania, Appellant.

Medical Associates of the Lehigh Valley, P.C., Appellee

v.

Commonwealth of Pennsylvania, Appellant.

Supreme Court of Pennsylvania.

Submitted Dec. 1, 2010.

Decided Dec. 21, 2011.

562

Thomas W. Bergen, Hartman Underhill & Brubaker, L.L.P., Lancaster, for Amicus Curiae, KDK, Inc., et al.

Bartholomew J. Deluca Jr., Karen Marie Gard, PA Office of Attorney General, Harrisburg, Linda L. Kelly, Pittsburgh, John G. Knorr III, Calvin Royer Koons, Carol L. Weitzel, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

Sharon Rose Paxton, Randy Lee Varner, McNees, Wallace & Nurick, LLC, Harrisburg, for Northeastern Pennsylvania Imaging Center and Medical Associates of Lehigh Valley, P.C.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice EAKIN.

In these consolidated appeals, the Commonwealth of Pennsylvania, Department of Revenue seeks review of the Commonwealth Court's decisions holding appellees' MRI[1] and PET/CT[2] Scan systems were not tangible personal property subject to sales tax under § 7202(a) of the Tax Reform Code of 1971, 72 P.S. § 7101 *et seq.*, because they were part of real estate structures. We reverse.

The facts relevant to both appeals, as established by joint stipulation, are set forth individually below, along with the procedural history of each case.

### *Northeastern Pennsylvania Imaging Center v. Commonwealth of Pennsylvania*

In December, 2003, Northeastern Pennsylvania Imaging Center purchased an MRI and PET/CT Scan system from Philips Medical Systems North America Company. Northeastern paid Philips $2,172,375 for the MRI system, and paid $129,774.02 in sales tax. For the PET/CT Scan system, it paid Philips $1,815,000, and paid $98,010 in sales tax. To prepare for installation of both systems in its facility, Northeastern made extensive structural changes to the building, which it owns. The changes included: revising the electrical, heating, ventilation, air conditioning, and plumbing systems; installing floor and ceiling supports; enlarging rooms; installing troughs in the walls and conduit above the ceilings to accommodate power cables and wire; installing radio frequen-

---

1. MRI, or magnetic resonance imaging, is a type of diagnostic radiography used to make images of tissues and organs of the human body. Taber's Cyclopedic Medical Dictionary 1230 (19th ed.2001).

2. A PET/CT, or positron emission tomography/computerized tomography, system uses radioactive substances administered to the patient to image anatomic information from a cross-sectional plane of the human body. Stedman's Medical Dictionary 1842 (27th ed.2000).

cy shielding in the walls, floor, and ceiling to prevent MRI radio signals from interfering with other devices; installing a vent for safe removal of cryogenic helium vapor the MRI magnet generated; installing lead panels for radiation shielding; enlarging doors in order to move the PET/CT Scan system into the building; and removing an outside wall in order to move the MRI system into the building.

The MRI system weighed 15,201 pounds and could only be moved by a crane. It took approximately five days to install. The system's magnet and patient table were bolted to the building, using anchors installed in concrete beneath the floor. Removal of the system would require several days of interior construction work and would necessitate removing an exterior wall to give a crane access to the system. The PET/CT Scan system weighed 12,375 pounds and took approximately two weeks to install. The system's gantry [3] and patient table were bolted to the building by anchors installed in concrete beneath the floor, and the system was hardwired to Northeastern's electrical system. Removal of the PET/CT Scan system would require several days. The MRI system remains in place in Northeastern's facility; however, the PET/CT Scan system became obsolete, and was removed and replaced with a new system in 2006. The new system was not at issue in this matter.

On July 20, 2004, the Department issued a letter ruling which stated, "[P]rospectively the sale and installation of an MRI to [a] taxable entity is considered a construction contract. The MRI is considered to be a permanent part of the real estate upon installation." Pennsylvania Sales and Use Tax Letter Ruling No. SUT–04–021, 7/20/04, at 1. Thus, the sale and installation of MRI and PET/CT Scan systems like the ones Northeastern purchased was no longer subject to sales tax, which only applies to the sale of tangible personal property and services. *See* 72 P.S. § 7202(a) (imposing six percent sales tax on sale at retail of tangible personal property or

3. The gantry is the large, cube-like machine with a circular opening in its center, in which the scanning occurs.

services). Instead, as part of a construction contract,[4] the sale and installation of MRI and PET/CT Scan systems would be subject to a use [5] tax under 72 P.S. § 7202(b), which imposes a six percent tax on the use of tangible personal property, paid by the seller or contractor. Ten months later, the Department rescinded its first letter ruling; it issued a second letter ruling which stated an installed MRI system would be subject to sales tax as tangible personal property. *See* Pennsylvania Sales and Use Tax Letter Ruling No. SUT–05–008, 5/20/05.

Northeastern had paid sales tax on its imaging systems in installments during a large portion of the period when the first letter ruling was in effect. It filed a claim with the Department December 7, 2006, seeking a refund of $362,811.88 for the sales tax paid on the systems and their service agreements. The Department denied Northeastern's refund claim, and Northeastern filed a petition for review with the Board of Finance and Review, which affirmed.

Northeastern petitioned the Commonwealth Court for review, seeking reversal of the Board's decision on the grounds that the Department's first letter ruling was correct, and the acquisition of the imaging systems did not trigger a sales tax event; rather, the systems were installed as part of a construction contract and thus were subject to use tax payable by the seller or contractor.[6] The Department countered that

4. Section 7201 defines "construction contract" as "[a] written or oral contract or agreement for the construction, reconstruction, remodeling, renovation or repair of real estate or a real estate structure." 72 P.S. § 7201(nn). The Code does not define "real estate," and its definition of "real estate structure," *see id.*, § 7201(qq), applies only to construction contracts with enumerated nonprofit organizations, which appellees are not.

5. Section 7201 defines "use" as including "[t]he obtaining by a construction contractor of tangible personal property or services provided to tangible personal property which will be used pursuant to a construction contract whether or not the tangible personal property or services are transferred." *Id.*, § 7201(o)(17).

6. Alternatively, Northeastern contended the Department's denial of its refund claim violated the Equal Protection Clause of the 14th Amendment to the United States Constitution and the Uniformity Clause of the Pennsylvania Constitution. Because the Commonwealth Court decided the case on the merits of Northeastern's claim that the imaging systems

Northeastern, not Philips (who sold the imaging systems), was responsible for the construction necessary to prepare the building for installation of the systems. It also argued the systems were items of tangible personal property, which were not so annexed to Northeastern's building that they became part of the realty.

In a published opinion, the Commonwealth Court reversed the Board's decision; it concluded the imaging systems, once installed, constituted realty, and thus were not subject to sales tax. Acknowledging that the Tax Reform Code's definition of "real estate structure" does not apply to for-profit corporations like Northeastern, the court relied on *In re Appeal of Sheetz*, 657 A.2d 1011 (Pa.Cmwlth.1995), which the parties contended set forth the appropriate test for determining whether the imaging systems were tangible personal property or part of the realty. The court noted, in a footnote, that the parties agreed *Commonwealth v. Beck Electric Construction, Inc.*, 485 Pa. 604, 403 A.2d 553 (1979), did not apply; although the case concerned the applicability of sales tax, it was partially superseded by statute insofar as it pertained to sales and use tax for tax-exempt entities. *See Northeastern Pennsylvania Imaging Center v. Commonwealth of Pennsylvania*, 978 A.2d 1055, 1061–62 n. 13 (Pa.Cmwlth.2009). The court further noted *Beck*'s analysis, which focused on an item's ease of portability in determining whether it was realty, was based on a regulation that had since been superseded; thus, the court did not apply *Beck*. *Id*.

Instead, the court relied on *Sheetz*, which was a real estate assessment case. At issue in *Sheetz* was whether canopies covering gasoline pumps at a service station became part of the real estate for purposes of assessing the real property's value. *Sheetz* identified three classes of chattel: (1) furniture and similar items, which are always personalty; (2) items annexed to the building or land to the extent they could not be removed without causing injury to the realty or themselves, which are always realty; and (3) items affixed to the realty

were not subject to sales tax, it did not reach the constitutional arguments.

that can be removed without damaging the item or the realty, which items can be either realty or personalty, depending on the circumstances. *Sheetz*, at 1012–13. Because the gas pump canopies fell into the third category, the Commonwealth Court considered, in assessing the circumstances: (1) the manner by which the canopies were affixed to the land; (2) the canopies were essential to the property's use as a gas station; and (3) the canopies were intended to be permanent. *Id.*, at 1013. Based on these factors, the *Sheetz* court concluded the canopies were realty and thus were to be included in the real estate assessment.

Applying the *Sheetz* analysis, the Commonwealth Court concluded the imaging systems fell within the third category, chattel which could be either realty or personalty, and proceeded to consider the three factors set forth in *Sheetz*. Regarding the first factor, *i.e.*, the manner of physical attachment of the systems, the court concluded the systems possessed the requisite degree of attachment to the building, based on the extensive, complex level at which their components were wired, bolted, and connected to the building. Regarding the second factor, *i.e.*, whether the systems were essential to the use of the building, the court held the owner's chosen use of the property determines whether the chattel is essential. The court concluded the systems were essential to the ongoing use of the building as an imaging center, noting the "numerous and specialized structural, electrical, and mechanical improvements to [Northeastern's building] would serve no function without the systems themselves." *Northeastern*, at 1065. Finally, the court found the third factor—whether the systems were intended to be permanent—was met, as they were installed with the intention that they remain in the building as long as Northeastern continues to use it as an imaging center or until the systems become obsolete and must be replaced.

Accordingly, the Commonwealth Court held the systems were realty under the *Sheetz* test, and thus "real estate structures" within the meaning of § 7201(nn) of the Tax Reform Code. Therefore, the court concluded the systems

were not subject to sales tax, and Northeastern was entitled to a refund; the court reversed the Board's order.

Senior Judge McCloskey dissented, disagreeing with the majority's conclusion that Northeastern intended the imaging systems to be a permanent part of the building. The dissent commented, "[T]he rapid advancement in medical technology fights against the majority's conclusion. In fact, leasing of this type of equipment is becoming the norm because of the need to remain current with the technology." *Northeastern,* at 1066–67 (McCloskey, S.J., dissenting).

### *Medical Associates of the Lehigh Valley, P.C. v. Commonwealth of Pennsylvania*

In June, 2000, Medical Associates entered into an agreement to purchase an MRI system from GE Medical Systems for $1,155,360; it subsequently assigned its rights under the agreement to First Union Commercial Credit Corporation, permitting First Union to take title to the system. In August, 2000, Medical Associates agreed to lease the system from First Union for 60 months, beginning December 31, 2000. The lease provided Medical Associates the option to purchase the system from First Union at the end of 60 months, and it exercised that option in 2005, paying $97,050.24. Medical Associates also purchased a CT Scan system from GE for $675,018 in 2002. Medical Associates paid sales tax on both transactions, totaling $100,976.40.

To prepare for installation of the imaging systems in its facility, Medical Associates made extensive structural changes to the building, which it leases. The changes included: revising the electrical, heating, ventilation, air conditioning, and plumbing systems; installing floor and ceiling supports; enlarging rooms; installing troughs in the walls and conduit above the ceilings to accommodate power cables and wire; installing radio frequency shielding in the walls, floor, and ceiling to prevent MRI radio signals from interfering with other devices; installing a vent for safe removal of cryogenic helium vapor the MRI magnet generated; installing lead

panels for radiation shielding; and removing an outside wall in order to move the MRI system into the building.

The MRI system weighed 20,599 pounds and could only be moved by a crane. It took approximately three days to install. The system's magnet and patient table were bolted to the building, using anchors installed in concrete beneath the floor. Removal of the system would require several days of interior construction work and would necessitate removing an exterior wall to give a crane access to the system. The CT Scan system also took several days to install. The system's gantry and patient table were bolted to the building by anchors installed in concrete beneath the floor, and the system was hardwired to Medical Associates' electrical system. The CT Scan system was replaced in 2006 with an updated system. It took approximately one week to remove the old system; the floor had to be reconstructed prior to installing the new system, which is not currently at issue.

Medical Associates filed a claim with the Department July 7, 2005, seeking a refund of $100,976.40 for the sales tax paid on the systems and their service agreements. The Department denied the refund claim, and Medical Associates filed a petition for review with the Board of Finance and Review, which affirmed.

Medical Associates petitioned the Commonwealth Court for review, seeking reversal of the Board's decision on the same grounds that Northeastern advanced, and raising similar arguments. In an unpublished decision, the Commonwealth Court reversed the Board, noting the issues raised were essentially identical to those in *Northeastern.* Accordingly, the court applied the *Sheetz* test and concluded, as in *Northeastern,* the imaging systems were "real estate structures" within the meaning of § 7201(nn) of the Tax Reform Code. Therefore, the court concluded the systems were not subject to sales tax, and Medical Associates was entitled to a refund of the sales tax it paid; the court reversed the Board's order. *See Medical Associates of the Lehigh Valley, P.C. v. Commonwealth of Pennsylvania,* No. 50 F.R. 2006, unpublished memorandum at 9–10, 2009 WL 2948528 (Pa.Cmwlth. filed August 5, 2009).

Senior Judge McCloskey dissented, expressing the same sentiments as in his dissent in *Northeastern.*

■ The Department has appealed both decisions. This Court has jurisdiction over the appeals pursuant to 42 Pa.C.S. § 723(b) ("Any final order of the Commonwealth Court entered in any appeal from a decision of the Board of Finance and Revenue shall be appealable to the Supreme Court, as of right, under this section."). As noted, these appeals present the issue of whether the sale of MRI and PET/CT Scan systems and related service agreements constitutes a sale of "tangible personal property or services" on which sales tax is due. This is an issue of statutory interpretation of the Tax Reform Act's applicable provisions. Therefore, it is a pure question of law; our standard of review is *de novo,* and our scope of review is plenary. *Dechert LLP v. Commonwealth of Pennsylvania,* 606 Pa. 334, 998 A.2d 575, 579 (2010).

■ In interpreting a statute, our goal is to ascertain and effectuate the legislature's intent. 1 Pa.C.S. § 1921(a). The statute's plain language is the best indication of this intent. *Dechert,* at 579 (citation omitted). When the statute's words are clear and free from all ambiguity, its letter is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). Tax statutes must be strictly construed against the Commonwealth, and any reasonable doubt regarding the application of the statute must be resolved in the taxpayer's favor. *Id.,* § 1928(b)(3).

Section 7202(a) of the Tax Reform Code imposes a six percent tax on the "sale at retail" of "tangible personal property or services, ... which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth...." 72 P.S. § 7202(a). "Sale at retail" includes "[a]ny transfer, for a consideration, of the ownership, custody or possession of tangible personal property[.]" *Id.,* § 7201(k)(1). "Tangible personal property" is defined as "[c]orporeal personal property including, but not limited to, goods, wares, [and] merchandise...." *Id.,* § 7201(m).

Section 7202(b) of the Code imposes a six percent "use" tax on tangible personal property purchased at retail, payable to the Commonwealth "by the person who makes such use." *Id.*, § 7202(b). "Use" includes "[t]he obtaining by a construction contractor of tangible personal property or services provided to tangible personal property which will be used pursuant to a construction contract whether or not the tangible personal property or services are transferred." *Id.*, § 7201(*o*)(17). As noted in n. 4, *supra*, a "construction contract" is "[a] written or oral contract or agreement for the construction, reconstruction, remodeling, renovation or repair of real estate or a real estate structure." *Id.*, § 7201(nn). The Code's definition of "real estate structure" does not apply to appellees. *See id.*, § 7201(qq); n. 4, *supra*.

■ Thus, the Code's plain language imposes a sales tax on the purchaser when tangible personal property is sold, and imposes a use tax on the contractor when tangible personal property is used as or becomes part of real estate or a real estate structure. The parties do not assert the Code's language in this regard is ambiguous; rather, they acknowledge the Code does not set forth a test for determining whether tangible personal property has been converted to realty, and urge this Court to look to case law for guidance.

To effectuate § 7202(a), 61 Pa.Code § 31.11 defines "sales activities" as: "An activity resulting from an agreement or contract under which a contractor transfers tangible personal property or performs services upon tangible personal property belonging to another person and *installs the property so as not to become a permanent part of the real estate.*" *Id.* (emphasis added). Section 31.11 also defines what items are "construction activities," which are subject to use tax under 72 P.S. § 7202(b): "An activity resulting from an agreement or contract under which a contractor *attaches or affixes tangible personal property to real estate so as to become a permanent part thereof.*" 61 Pa.Code § 31.11 (emphasis added). The question therefore is simple—were these machines installed or attached so as to become a permanent part of the real estate?

■■■ Both parties, as well as the Commonwealth Court, agreed the test in *Sheetz* was applicable; the only question was what the result of *Sheetz*'s application should be. *See Northeastern*, at 1062. The parties also agreed, before the Commonwealth Court, that *Beck*'s test did not apply; thus, the court did not discuss it. *See Northeastern*, at 1061–62 n. 13. However, we are not bound by the parties' position that *Sheetz* controls, or by their agreement that *Beck* does not.[7] It is our role to review all precedent arguably pertaining to the issue before us. If, in our review, we reach the conclusion that a more appropriate test exists than that applied by the court below, we would be remiss in not clarifying such test. Our review of both *Sheetz* and *Beck* leads us to conclude, for the following reasons, that *Beck*'s test applies.

*Sheetz* was a decision involving neither sales tax nor use tax. The question there was whether an extension of the building's roof, artfully described as a canopy, was part of the real estate, so as to be considered when assessing the property for real estate tax purposes. In contrast, the case before us concerns a determination, under a specific and quite different statute, of whether the sale of this equipment is subject to sales tax paid by the purchaser, or use tax paid by the seller.

■■■ In the instant case, the Commonwealth Court under-standably looked to *Sheetz*, not *Beck*, for guidance. *Sheetz* may have considered *Beck*, but it did not supplant *Beck*, and the principles in *Beck* are more suited to the inquiry before us. When dealing with sales versus use tax, we should apply precedent that applies to sales or use tax, not tests dealing

---

7. Although the parties conceded in the Commonwealth Court that *Beck* did not apply, they mention the case in their briefs. The Department acknowledges it did not advocate application of *Beck* before the Commonwealth Court, but concedes its approach has advantage in ease of application. Nonetheless, the Department argues, the equipment at issue here is personal property under either *Sheetz* or *Beck*, contending *Sheetz*'s test is in harmony with *Beck*'s. *See* Appellant's Brief, No. 93 MAP 2009, at 13 n. 7; No. 94 MAP 2009, at 13 n. 6. Appellees counter that *Beck* is distinguishable and does not control; however, even if it did, the equipment at issue is not portable and easily removable so as to be taxable as personal property. *See* Appellee's Brief, No. 93 MAP 2009, at 11–12 n. 7; No. 94 MAP 2009, at 13–14 n. 8.

with real estate tax. Concepts that are relevant to one tax may not be entirely applicable to another—the statutes having different wording and different purposes.

The concepts of *Sheetz* seek to determine *if* a tax is due— the concepts of *Beck* deal with *which* tax is due. The concepts of affixing to real estate are common, but they are not identical, and the result of treating them as identical goes beyond the obvious. The Commonwealth Court's decision finds use tax applies because $4,000,000 worth of equipment has become a permanent part of these buildings—the state has its tax, which should end the matter. However, this decision means the real estate taxes on the premises are going to skyrocket. The assessor would be patently derelict if there is no reassessment of a building suddenly worth so much more than it was. In addition, if we were to apply *Sheetz* in the instant matter, any appeal regarding real estate tax assessment will be moot, the highest court in the land having used real estate tax precedent to resolve the issue as to this specific building and these machines.

We are better served by following the quite apposite precedent of our own Court, rather than abandoning it for an inapposite real estate tax case from our Commonwealth Court. We have no quarrel with *Sheetz*,[8] but find no reason to apply it to a case that concerns a different tax law, particularly where there is Supreme Court authority directly on point.

The distinction between sales and use taxes was squarely dealt with by this Court in *Beck*. There, we considered whether an electrical construction contractor was a "user" of goods subject to use tax, or a "vendor" entitled to claim the "resale" tax exclusion of the Tax Act of 1963. Beck purchased electrical machinery and equipment from its suppliers, then sold the

8. *Sheetz* 's third prong, the property owner's intent as manifested by conduct, is at best a curious one, subject to variant results according to circumstances—is the same chattel to be subject to one tax in one case, and the other tax in the next case, based on perceptions of the owner's intent? What is the point of making intent a prong at all? One thing we may presume with confidence is that if any party has intent vis a vis the tax laws, it will always be to *avoid* tax. This makes the premise of this prong very dubious.

equipment to the Commonwealth's General Services Administration (GSA) and installed it in several public facilities pursuant to construction contracts with the GSA.

The Commonwealth Court concluded use tax was properly imposed under the Department of Revenue's Regulation 150 [9] on the sale and installation of certain items (transformers, rectifier, and switchgear), which were an integral part of the building's electrical system. However, the court concluded use tax was improperly imposed on other items (sound and master clock systems), which although installed pursuant to a construction contract, were not intended to become a permanent part of the real estate. Both parties appealed.

This Court, applying Regulation 150, affirmed the exclusion of the sound and master clock systems from use tax assessment, and reversed the imposition of use tax on Beck's sale and installation of the transformers, rectifier, and switchgear. We noted the parties stipulated this latter equipment could be relocated with no damage to it, and after relocation, it would retain its original form, character, and function. *Beck*, at 556. Thus, guided by Regulation 150's list of examples of property not subject to use tax, we focused on the items' "degree of portability, without injury to the character of the goods," *id.*, and concluded "what matters under Regulation 150 is the ease with which the property is disassociated from the realty." *Id.*, at 557. Accordingly, we held the transformers, rectifier, and switchgear were not subject to use tax as they were not part of the real estate, and we reversed the portion of the Commonwealth Court order pertaining to them. *Id.*, at 558.

When *Beck* was decided, 72 P.S. § 3403–201(a) imposed a tax on retail sales in the Commonwealth. To determine whether an item was subject to sales tax or use tax, *Beck* focused on the Department of Revenue's Regulation 150, promulgated pursuant to § 580(a) of the Tax Act of 1963 for Education. 72 P.S. § 3403–580(a) (repealed 1971). Regulation 150's principles still exist, now authorized by § 7202(a), and

9. Regulation 150 spoke to when a construction contractor was a user of goods subject to use tax and when the contractor was a vendor entitled to claim the resale exclusion.

embodied in 61 Pa.Code §§ 31.11–.16. *See Bruce & Merrilees Electric Co. v. Commonwealth,* 109 Pa.Cmwlth. 101, 530 A.2d 994, 997 (1987).

Section 31.11 further states that absent proof to the contrary, certain items will be presumed not to become a permanent part of the real estate; the same section also provides examples of what will be presumed, absent proof to the contrary, to become a permanent part of the real estate. *See* 61 Pa.Code § 31.11. The examples listed are quite instructive. Specifically regarding medical equipment, only nurses' aid stations are listed as an item presumed to be so affixed as to become part of the property and thus be subject to use tax. Such stations are empirically distinct from equipment, different in terms of structural features, their function and placement, and their usage.

*Beck* looked to Regulation 150, now embodied in § 31.11, to determine whether an object was subject to sales or use tax, and so should we. Section 31.11's presumption that other items are not affixed to the real estate, and thus subject to sales tax, applies to many enumerated items found in a medical setting, including operating room lights, oxygen and gas systems, and, most tellingly, x-ray illuminators and equipment. *Id.* While these listings are not exhaustive, we can hardly ignore them. Clearly an MRI machine is more like x-ray equipment than a nurses' station. There is no factual reason in this record to ignore these logical presumptions and empirical guideposts.

*Beck*'s focus on the character of the object, its ability to be installed and removed, its degree of portability, and whether it maintained its functional integrity after installation, seems the more appropriate query.[10] *Beck*'s inquiries address salient matters better than examining "manifestation of intent through conduct." Northeastern owns the building that hous-

10. We note the Commonwealth Court's observation that the imaging systems were not installed in the original construction of the buildings, were not permanent improvements remaining with the buildings on resale, and were not so affixed that their detachment from the buildings would damage them or the buildings. *Northeastern,* at 1063.

es its imaging equipment, *see* Partial Stipulation of Facts, No. 635 F.R. 2007, 6/12/08, at 4 ¶ 14, whereas Medical Associates leases the office space where its equipment is situated. *See* Partial Stipulation of Facts, No. 50 F.R. 2006, 6/12/08, at 6 ¶ 22. Under these facts, do Medical Association's intentions about permanence have any bearing, when it is merely leasing the premises? Does the fact that Northeastern owns the building in which it installed its equipment make a difference in ascertaining its intent? The *Sheetz* factors do not provide a solution. Again, *Beck*'s inquiries are the proper ones for our purposes.

 Even if *Sheetz* were the proper test, these machines were not acquired by the contractor for "use pursuant to a construction contract." They were the reason *for* renovation of the existing building, but they were not part *of* the building renovation. Use pursuant to a construction contract is a term referencing items of personalty that are really part of construction—things such as sinks, wiring, flooring, carpet and wallpaper, recessed lighting—things that are subject to sales tax for you and me at the hardware store, but subject to use tax if part of a construction contract. The state will have its tax, be it one or the other—why then are there two types of tax? It makes eminent sense to collect sales tax from you and me on piecemeal purchases, but can one parse out the sales tax on every nail used and add it to the bill given the ultimate owner? No, it is inefficient at best to charge sales tax at the end of a construction contract—there, tax is more easily rolled into the price of materials "used" in the construction contract.

The construction contract here did not *use* the big piece of medical equipment that would eventually be housed in the building. The construction in fact was just that—a means of housing the imaging equipment, not a means of becoming one with it. The real estate does not take the pictures. If a person builds a garage to house the family cars, the cars are not subject to use tax just because they necessitated the construction. The machines may have been bolted down to hold them steady—there is a need for precision in their usage—but so are washing machines in laundromats and pool

tables in billiard halls, yet would one argue these are part of the real estate? The construction contract did not "use" these devices—it simply resulted in a place to put them. They were installed by their seller, who came and hooked them up once the construction was accomplished. That is not "usage" within the contemplation of the statutory definitions. The required element of use tax, usage in a construction contract, is just not here.

In the end, these machines are nothing more than cameras—they may be big, bulky, and complex, but they are just devices that take pictures, the evolution, if you will, of the x-ray machine. While their size makes them cumbersome, size does not make them part of the building. The machines are removable and replaceable—some of them, in fact, have already been removed and replaced. When technology passes these machines by, and surely it will, they will be taken out, the newer devices will come in, and the imaging will go on.

Application of the *Beck* test, the prevailing and appropriate authority of this Court, results in the same conclusion as does basic empirical application of the Code and its examples, and the language of the tax statute itself. Thus, we hold the equipment is subject to sales tax, and reverse the Commonwealth Court's decision.

Because of our holding that sales tax applies, Northeastern and Medical Associates' alternative argument that the denial of their refund claims violated the federal constitution's Equal Protection Clause and the state constitution's Uniformity Clause must be addressed. *See* n. 6, *supra*. As the Commonwealth Court did not reach this issue below, remand to that court is required for disposition of the merits of this issue.

Order reversed; case remanded. Jurisdiction relinquished.

Chief Justice CASTILLE, Justices TODD, McCAFFERY, and ORIE MELVIN join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice BAER files a dissenting opinion.

Justice SAYLOR, dissenting.

I tend toward the majority's position that—to the degree the Department has established valid legislative regulations—such regulations should establish the primary frame of reference in these cases. I also believe that the Department should be active in promulgating reasonable regulations to provide essential guidance. In this regard, common-law fixtures analysis seems to me to entail too great a degree of uncertainty to govern for tax-classification purposes. *See, e.g., Strain v. Green,* 25 Wash.2d 692, 172 P.2d 216, 218 (1946) (Robinson, J.) (commenting that "[e]very lawyer knows that cases can be found in [the fixtures] field that will support any position that the facts of his particular case require him to take").

In the present case, however, in terms of moving away from a fixtures overlay, the difficulty is that the Department previously agreed that such analysis should apply in this litigation. *See, e.g.,* Brief of Appellant, No. 93 MAP 2009, at 13 n. 7 (explaining that "[w]e advocated for the use of *Sheetz* ... before the Commonwealth Court"); *Ne. Pa. Imaging Ctr. v. Commonwealth,* 978 A.2d 1055, 1061–62 & n. 13 (Pa.Cmwlth. 2009) (reflecting the parties' belief that *Sheetz,* rather than *Beck,* should be applied). Since the Department is the appellant before this Court—and as such is subject to prevailing issue-preservation obligations, I would accede to a reliance on *Sheetz* in these appeals and reserve the announcement of a rule of general application to a case in which the counter-positions have been appropriately raised and preserved.[1] In applying that case's precepts, moreover—most notably, the "extent of annexation" standard, *id.* at 1063—I would reach the same conclusion as did the Commonwealth Court majority. Accordingly, I respectfully dissent.

1. Indeed, the Department's eleventh-hour adjustment to its argument on appeal is particularly problematic where it already had reversed its position concerning the obligation of those in Appellees' circumstances to pay the tax in the first instance, to Appellees' substantial detriment. *See generally Ne. Pa. Imaging,* 978 A.2d at 1059.

Justice BAER, dissenting.

I respectfully dissent from the Majority's conclusion that an MRI system and a PET/CT Scan system (collectively "imaging systems") are "nothing more than cameras," Op. at 579, 35 A.3d at 762, and, thus, constitute tangible personal property subject to state sales tax. Due to the extensive structural building modifications required for installation and removal of the imaging systems, including exterior wall removal, the connection of the systems to the building's plumbing, cooling, and electrical systems, and the bolting of the components of the systems into the concrete sub-floor, I would affirm the Commonwealth Court's holding that the imaging systems became a part of the real estate pursuant to a construction contract, and, thus, are subject to a use tax, rather than sales tax.

The Majority acknowledges that in determining whether the sale of imaging systems is subject to a sales or use tax, the court must examine whether the imaging systems were installed or attached so as to become a permanent part of the real estate. Op. at 570–72, 35 A.3d at 758–59. This inquiry derives from the plain language of the Tax Reform Code of 1971, 72 P.S. § 7201 *et seq.*, and the relevant provisions of the Pennsylvania Code. Specifically, 72 P.S. § 7202(a) imposes a six percent sales tax on "each separate sale at retail of tangible personal property or services." "Sale at retail" includes "[a]ny transfer, for a consideration, of the ownership, custody or possession of tangible personal property[.]" *Id.* § 7201(k)(1). In turn, "tangible personal property" is defined as "[c]orporeal personal property including, but not limited to, goods, wares [and] merchandise...." *Id.* § 7201(m). Similarly, the Pennsylvania Code defines "sales activities" as "[a]n activity resulting from an agreement or contract under which a contractor transfers tangible personal property or performs services upon tangible personal property belonging to another person and installs the property *so as not to become a permanent part of the real estate.*" 61 Pa.Code § 31.11 (emphasis added).

In contrast, 72 P.S. § 7202(b) imposes a six percent "use" tax on tangible personal property purchased at retail "by the person who makes such use." *Id.* Section 7201 defines "use"

as including "[t]he obtaining by a construction contractor of tangible personal property ... which will be used pursuant to a construction contract.... *Id.* § 7201(*o* )(17). Significantly, 72 P.S. § 7201(nn) defines "construction contract" as "[a] written or oral contract or agreement for the construction, reconstruction, remodeling, renovation or repair of real estate or a real estate structure." Finally, "construction activities" are defined in the Pennsylvania Code as "[a]n activity resulting from an agreement or contract under which a contractor attaches or affixes tangible personal property to real estate *so as to become a permanent part thereof....*" 61 Pa.Code § 31.11 (emphasis added).

As noted by the Majority and set forth above, the parties do not assert that the statutory language is ambiguous, and agree that this case turns on whether the imagining systems become part of the real property upon installation. In this regard, the parties note that this controversy arises because the Tax Reform Code does not set forth a test for determining whether tangible personal property has been converted to realty. Thus, this Court must choose the appropriate test for deciding whether a particular piece of property has become a part of the real estate, and thereby is subject to a use tax, as opposed to a sales tax.

The Commonwealth Court below employed the test set forth in *In re Appeal of Sheetz,* 657 A.2d 1011 (Pa.Cmwlth.1995), which enumerated three factors for determining whether tangible property becomes so affixed to the land that it becomes part of the real estate. *See Sheetz,* 657 A.2d at 1013 (stating the factors to consider as: (1) the manner by which the chattel is physically attached or installed; (2) the extent to which it is essential to the permanent use of the building or other improvement; and (3) the intention of the party who attached or installed the chattel to make it a permanent part of the realty). The Commonwealth Court concluded that the imaging systems possessed the requisite degree of "attachment" to favor a finding that the systems became part of the realty; that the imaging systems were essential to the particular purpose of the establishment, *i.e.,* an imaging facility; and

that Appellees intended the imaging systems to be affixed permanently so long as the building continued to be used as an imaging center or until the equipment became obsolete.

Although the parties did not object to the Commonwealth Court's consideration of the *Sheetz* factors in this regard, the Majority nevertheless rejects the *Sheetz* test, and analyzes the case pursuant to the factors considered by this Court in *Commonwealth v. Beck Electric Construction, Inc.*, 485 Pa. 604, 403 A.2d 553 (1979), which involved, as does this case, a determination of whether the sale of certain equipment was subject to a sales or a use tax. The Majority characterizes the *Beck* test as focusing on "the character of the object, its ability to be installed and removed, its degree of portability, and whether it maintained its functional integrity." Op. at 575, 35 A.3d at 761. Because I believe that both the *Sheetz* and *Beck* factors focus primarily on the ease of installation of the item, the ease of removal, and the degree of attachment, I believe that the result in this case is the same regardless of whether the *Sheetz* or *Beck* test is employed.[1]

Under either test, the imaging systems became part of the realty upon installation and, thus, Appellees are entitled to a refund of their sales tax. In the *Northeastern* case, for example, the MRI system weighs 15,201 pounds, and includes a magnet assembly, a patient table, power and control cabinets, and a computer system for image processing. The system is generally installed in three separate rooms—a mag-

1. Nevertheless, I disagree with some of the Majority's reasoning. The Majority found the *Sheetz* factors inapplicable because *Sheetz* involved real estate taxes, and not a determination of whether a sales or a use tax should have been imposed, as in *Beck* and the instant case. The Majority states that "[t]he concepts of *Sheetz* seek to determine if a tax is due—the concepts of *Beck* deal with which tax is due." Op. at 573, 35 A.3d at 759. I do not share this view, as the factors set forth in *Sheetz* merely reflect the common law of fixtures, and are not necessarily limited to cases involving a determination of real estate taxes. I further disagree with the Majority's assertion that if we were to apply the *Sheetz* test and conclude that the imaging systems became a permanent part of the buildings, the real estate taxes would "skyrocket." Op. at 573, 35 A.3d at 759. Such conclusion not only exceeds the scope of this appeal, but also assumes improperly that permanent installation of particularized equipment in an office building results in an increase in the fair market value of the office building as a whole.

net room, an adjoining room containing power and control components, and yet another adjoining room containing the operator's console and computer equipment. Installation requires: removal of a portion of an exterior brick wall to enable a crane to place the magnet inside the structure, and replacement thereof; strengthening of virtually all of the floors and ceiling supports of the building so that they can withstand the weight of the magnet; installation of troughs in the walls and conduits above the ceiling to accommodate the many cables and wires necessary to power the MRI; installation of power and communications wires and cable into the walls and ceiling of the MRI room; connection of the wires and cables to the MRI components; insertion of radio frequency shielding in the walls, floors, and ceiling to prevent the radio signals broadcast by the MRI equipment from interfering with other devices; installation of a vent to allow for the safe removal of cryogenic helium vapor generated by the MRI magnet; connection of the equipment to the building's electrical, heating, ventilation/air conditioning, and plumbing systems; and bolting of the MRI magnet and patient table to the floor.

Removal of the MRI system would likewise require the removal of a portion of an exterior wall to allow a crane to access and remove the MRI magnet, and the replacement of that section of the wall; disconnection and removal or abandonment of the many wires and cables in the walls, floor, and ceiling; disconnection of the MRI from the building's electrical, heating, ventilation/air conditioning and plumbing systems, and repair as necessary to those systems; removal or abandonment of the radio frequency shielding in the walls, floor and ceiling; and the unbolting of the MRI magnet and patient table from the floor, and the necessary repairs to the floor. The same general procedure, and certainly the same extensive modifications and repairs, are applicable to the PET/CT Scan system also under consideration in this case.

The Majority finds that, notwithstanding the obvious extensiveness of the modifications to the real property to accommodate the imaging systems, the fact that they can be removed and replaced renders them tangible personal property, rather than a permanent part of the real estate. Respectfully, I find

this proposition wholly unconvincing, and submit that by this standard nothing can ever be deemed part of the real estate. A furnace, kitchen cabinets, water heaters, and toilets can all be removed and replaced from real property far easier than these imaging systems. Nonetheless, all have been deemed part of real property upon installation. *See* Department of Revenue Regulation 150, now embodied in 61 Pa.Code § 31.11 (providing that, *inter alia*, a furnace, kitchen cabinets, water heaters and toilets are presumed to become part of the real estate absent proof to the contrary); *see also Clayton v. Lienhard*, 312 Pa. 433, 167 A. 321 (1933) (explaining that chattels which have become so annexed to the property that they cannot be removed without material injury to the real estate or to themselves become a part of the realty, even in the face of an expressed intention that they be considered personalty). I must ask rhetorically how these items are unquestionably deemed part of the real estate, and yet the imagining systems are not.

Accordingly, I dissent from the Majority's holding that the imaging systems are tangible personal property subject to sales tax. In my view, application of the *Sheetz* or *Beck* test supports the Commonwealth's Court's holding that the imaging systems became a part of the real estate pursuant to a construction contract, and, thus, are subject to a use tax, but not a sales tax.