J-E02001-16

2016 PA Super 300

| | |
|---|---|
| NANCY NICOLAOU AND NICHOLAS NICOLAOU, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| JAMES J. MARTIN, M.D., LOUISE A. DILLONSYNDER, CRNP, JEFFREY D. GOULD, M.D., ST. LUKE'S HOSPITAL, ST. LUKE'S HOSPITAL AND HEALTH NETWORK, ST. LUKE'S HOSPITAL UNION STATION MEDICAL SURGICAL CLINIC D/B/A ST. LUKE'S SOUTHSIDE MEDICAL CENTER, ST. LUKE'S ORTHOPAEDIC SURGICAL GROUP, AND NAZARETH FAMILY PRACTICE, | |
| Appellees | No. 1286 EDA 2014 |

Appeal from the Order Entered February 24, 2014
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2012-C-0518

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES,
PANELLA, SHOGAN, LAZARUS, OLSON, and OTT, JJ.

OPINION BY SHOGAN, J.:                    **FILED DECEMBER 22, 2016**

Appellants, Nancy and Nicholas Nicolaou ("the Nicolaous"), appeal

from the February 24, 2014 order granting summary judgment in this

medical malpractice action in favor of Appellees, James J. Martin, M.D.;

Jeffrey D. Gould, M.D.; St. Luke's Hospital; St. Luke's Hospital and Health

Network; St. Luke's Hospital Union Station Medical Surgical Clinic, d/b/a St.

Luke's Southside Medical Center; St. Luke's Orthopaedic Surgical Group; and

Nazareth Family Practice. For the following reasons, we affirm.

The trial court summarized the factual and initial procedural history of

this case as follows:

> The facts of the case provide that sometime in 2001, Nancy Nicolaou was bitten by a tick on her left ankle. Beginning in August, 2001, Mrs. Nicolaou began seeking medical treatment because she was experiencing a number of maladies that she associated with the tick bite. At first, Mrs. Nicolaou developed a rash near the sight [sic] of the bite and experienced numbness and tingling in her left toe, fatigue, and lower back pain. Over time, these symptoms expanded to include: incontinence, total loss of bladder control; tingling and numbness throughout her body, including both legs and feet; difficulty walking; and confinement in a wheelchair.

> Each of the [Appellees] acted as Mrs. Nicolaou's treating physician at different times between 2001 and 2008. Mrs. Nicolaou was a patient of dismissed co-defendant Dr. Stephen P. Falatyn, an alleged agent of [Appellees] St. Luke's Hospital and St. Luke's Health Network, in August of 2001. Mrs. Nicolaou was a patient of [Appellee] Dr. James J. Martin, an alleged employee of [Appellee] Nazareth Family Practice, from approximately June 14, 2002 through June 14, 2005. Mrs. Nicolaou was a patient of co-defendant Louise A. Dillonsnyder, CRNP,[1] an alleged agent of [Appellees] St. Luke's Hospital, St. Luke's Health & Health Network, and St. Luke's Hospital Union Station Medical Surgical Clinic, from May 27, 2005 through December 20, 2006. Mrs. Nicolaou was a patient of [Appellee] Dr. Jeffrey D. Gould, an alleged agent of [Appellees] St. Luke's Hospital and St. Luke's Hospital & Health Network, in 2007 and 2008.

---

[1] Louise Dillonsnyder was not included in the motion for summary judgment that is the subject of this appeal, and she subsequently was dismissed as a defendant. As such, she is not a party to this appeal.

During Mrs. Nicolaou's treatment, Dr. Falatyn and [Appellees] Martin, Dillonsnyder, and Gould all ordered a battery of tests, including four Lyme Disease tests; none of the tests produced a positive result for Lyme Disease. Consequently the [doctors] did not diagnose Mrs. Nicolaou with or treat her for Lyme Disease.

On July 3, 2006, [Appellee] Nurse Dillonsnyder ordered an MRI of the brain. The results of the MRI suggested that Mrs. Nicolaou could be suffering from either multiple sclerosis (MS) or Lyme Disease. [The doctors] diagnosed Mrs. Nicolaou with and treated her for MS. Dr. Gould told Mrs. Nicolaou that she did not have Lyme Disease and he continued to believe that she did not have Lyme Disease. Mrs. Nicolaou stopped treating with the [Appellees] sometime in 2008.

Sometime in 2007, Mrs. Nicolaou suspected that [Appellees] incorrectly diagnosed her with MS and that she was actually suffering from Lyme Disease due to the symptoms she experienced near the 2001 tick bite. As a result, Mrs. Nicolaou sought the help of Nurse Practitioner Rita Rhoads after Mrs. Nicolaou learned through research on the internet that Nurse Rhoads had a history of treating patients for Lyme Disease whom other medical professionals had previously incorrectly diagnosed as suffering from MS. Mrs. Nicolaou met with and was examined by Nurse Rhoads on five occasions between July 20, 2009 and February 1, 2010, specifically: July 20, 2009; September 21, 2009; November 9, 2009; December 7, 2009; and February 1, 2010. During each of the appointments, Nurse Rhoads recorded an assessment of "probably Lyme [Disease]" stemming from the 2001 tick bite on Mrs. Nicolaou's left ankle and prescribed antibiotics to fight the Lyme Disease. Also, during each of the appointments, Nurse Rhoads told Mrs. Nicolaou that she believed Mrs. Nicolaou was suffering from Lyme Disease, and that, as a result of that diagnosis, Nurse Rhoads was prescribing antibiotics to fight the Lyme Disease.

During some of the appointments, Nurse Rhoads recommended that, in order to confirm Nurse Rhoads' diagnosis of Lyme Disease, Mrs. Nicolaou should undergo a test offered by a company called IGeneX, Inc. (IGeneX). Mrs. Nicolaou testified that she did not get the test before February 1, 2010, because she wanted to see how her symptoms were going to react to the

antibiotics. Nurse Rhoads testified that Mrs. Nicolaou did not have the IGeneX test done when it was first recommended because Mrs. Nicolaou said she could not afford it. Mrs. Nicolaou testified that she voluntarily stopped purchasing medical insurance at some point in 2005 because her insurer was not covering the cost of many of the tests ordered by her physicians; she understood that she would be personally responsible for all costs associated with tests that might be ordered by her medical care providers going forward.

Nurse Rhoads administered the IGeneX Lyme Disease test to Mrs. Nicolaou on February 1, 2010. Nurse Rhoads sent Mrs. Nicolaou's test specimen to the IGeneX laboratory in Palo Alto, California. On February 12, 2010, IGeneX completed its analysis of the test. On February 13, 2010, Nurse Rhoads informed Mrs. Nicolaou via e-mail that the test results were positive for Lyme Disease.

The day that Mrs. Nicolaou received the positive test results, she posted a message on her Facebook[2] page that confirmed her subjective opinion that she believed she had Lyme Disease well before receiving the IGeneX report:

> Today i got my blood test back from igenix [*sic*] labs to test for lyme disease and it came back positive!!!!!!!!!!!!! i had been telling everyone for years i thought it was lyme and the doctors ignore me, thank you god you have answer [*sic*] my prayers!!!!!!!!! Now its [*sic*] all in your hands!!!!!!!!!!!!

[The Nicolaous] initiated this lawsuit against [Appellees] by way of [a] complaint filed on February 10, 2012. Amended complaints were filed on April 19, 2012 and May 31, 2012. In the second amended complaint, Mrs. Nicolaou asserts medical malpractice claims against each of the [Appellees]. Based on the injuries allegedly suffered by his wife as a result of

---

[2] Facebook is a social networking site where "[u]sers of that Web site may post items on their Facebook page that are accessible to other users, including Facebook "friends" who are notified when new content is posted." ***Elonis v. United States***, ___ U.S. ___, ___, 135 S.Ct. 2001, 2004 (2015).

[Appellees'] purported negligence, Mr. Nicolaou also asserts claims against each of the [Appellees] for loss of consortium.

In their Answer with New Matter of [Appellees] to the Second Amended Complaint (Answer), [Appellees] averred a violation of the statute of limitations as an affirmative defense to all of the [Nicolaous'] claims.

[The Nicolaous] averred in their Second Amended Complaint that although they did not initiate this action until more than three years after Mrs. Nicolaou's last contact with [Appellees], the statute of limitations is not a bar to their claims due to the operation of the discovery rule. [The Nicolaous] assert that [Appellees] are estopped from asserting a statute of limitations defense because reasonable people in the position of [the Nicolaous] could not have discovered any negligence until February 13, 2010, at the earliest; the Complaint was filed within two years of that date.

Trial Court Opinion, 2/24/14, at 2–6 (citations to the record omitted).

After discovery was completed, Appellees filed a motion for summary judgment on December 6, 2013, and the Nicolaous filed a response on December 31, 2013. The trial court granted Appellees' motion on February 25, 2014, holding that the Nicolaous had commenced their action after the prescribed statutory period for bringing the claim had expired, and that the statute of limitations was not tolled by application of the discovery rule. Trial Court Opinion, 2/24/14, at 14.[3] On April 21, 2014, the Nicolaous filed a

_____

[3] An action to recover damages for injuries to the person caused by the negligence of another must be commenced within two years. 42 Pa.C.S. § 5524(2).

notice of appeal.[4]  While the trial court did not direct the Nicolaous to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and they did not do so, the trial court filed an opinion in support of its order on May 9, 2014.[5]

The Nicolaous originally proceeded *pro se* in this appeal.  In a split decision, a three-judge panel of this Court filed a Memorandum reversing summary judgment, with one judge dissenting.  **Nicolaou v. Martin**, 1286 EDA 2014 (Pa. Super. 2016) (unpublished memorandum).  Thereafter, Appellees filed a motion for reargument *en banc*.  On June 3, 2015, this Court granted *en banc* reargument and withdrew the March 24, 2015 decision.

The Nicolaous filed new *pro se* briefs, and Appellees timely filed their briefs.  In August of 2015, counsel entered his appearance on behalf of the Nicolaous.  Pursuant to the Nicolaous' September 14, 2015 Motion To Permit

_____

[4]  Although the Nicolaous filed the notice of appeal more than thirty days after the trial court's order granting summary judgment, the notice of appeal is not untimely.  Louise Dillonsnyder was not included in the summary judgment motion, and therefore the order granting summary judgment was not a final order from which the Nicolaous were required to appeal within thirty days pursuant to Pa.R.A.P. 903(a).  A final order is any order, *inter alia*, that disposes of all claims and of all parties.  Pa.R.A.P. 341(b)(1).  All of the claims and parties to this action were not disposed of until Louise Dillonsnyder was dismissed from the action by *praecipe* dated March 28, 2014.

[5]  The trial court's Rule 1925(a) opinion directs us to the opinion attached to its February 24, 2014 order granting summary judgment.

a Supplemental Filing, we entered an order on September 21, 2015, continuing oral argument and directing the Nicolaous to file a counseled, supplemental brief, which they did on October 13, 2015. Appellees filed a response to the supplemental brief on November 3, 2015. This Court entered an order striking both briefs on December 17, 2015, and directed counsel for the Nicolaous to file an appropriate appellate brief pursuant to the Pennsylvania Rules of Appellate Procedure. Although both parties filed their briefs in January of 2016, the Nicolaous' brief once again failed to address the issues on appeal. This Court was compelled to strike the Nicolaous' brief on March 17, 2016, and we directed counsel to file a proper appellate brief addressing the relevant issues on appeal. On April 14, 2016, the Nicolaous filed a brief, and on May 13, 2016, Appellees filed a responsive brief. We entertained oral argument on August 2, 2016. This matter is now ripe for disposition.

The Nicolaous raise the following questions in this appeal:

A. Did the Trial Court error in granting [Appellees'] Motion for Summary Judgment and holding that [the Nicolaous'] medical malpractice action was time barred under 42 Pa.C.S. §5524(2) and did not meet the Discovery Rule Exception when [Mrs. Nicolaou] did not, and was financially unable to, confirm [Appellees'] negligent misdiagnosis until final medical testing confirmed she had Lyme Disease on February 13, 2010?

B. Did the Trial Court abuse its discretion in granting [Appellees'] Motion for Summary Judgment when there was a genuine issue of material fact, which should be presented to a jury, as to whether [the Nicolaous'] medical malpractice action is tolled from the running of the Statute

- 7 -

of Limitations under 42 Pa.C.S. §5524(2) by the Discovery Rule?

The Nicolaous' Brief at 2. We address the issues in tandem.

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to relief as a matter of law. **Matharu v. Muir**, 86 A.3d 250, 255 (Pa. Super. 2014) (*en banc*) (citing Pa.R.C.P. 1035.2). We exercise plenary review in an appeal from an order granting summary judgment. **Id**. As such, when reviewing whether there are genuine issues of material fact, our standard of review is *de novo*; therefore, "we need not defer to determinations made by lower courts." **Gleason v. Borough of Moosic**, 15 A.3d 479, 484 (Pa. 2011) (citing **Fine v. Checcio**, 870 A.2d 850, 857 n.3 (Pa. 2005)). Moreover, an appellate court may reverse a grant of summary judgment only if there has been an error of law or an abuse of discretion. **Kennedy v. Robert Morris Univ.**, 133 A.3d 38 (Pa. Super. 2016), *appeal denied*, 145 A.3d 166 (Pa. 2016). "[W]e will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." **Matharu**, 86 A.3d at 255.

In essence, the trial court agreed with Appellees and granted summary judgment, determining that the Nicolaous' cause of action was barred by the two-year statute of limitations applicable to negligence actions. 42 Pa.C.S. § 5524. The Nicolaous' position is that the entry of summary judgment was improper because they had been unable, through reasonable diligence, to

discover the cause of Mrs. Nicolaou's injury until February 13, 2010, the date Mrs. Nicolaou received the results of the IGeneX test, and therefore, the applicable statute of limitations had been tolled until that time. Thus, the Nicolaous contend that the trial court erred in concluding that their medical malpractice action was time-barred by 42 Pa.C.S. § 5524(2).

We analyze this case with consideration of the following principles:

Generally, a cause of action first accrues when a party is injured, and an action for personal injury must be filed within two years to satisfy the statute of limitations. 42 Pa.C.S. § 5524(2). . . . The discovery rule is a judicially created exception that tolls the running of the applicable statute of limitations when an injury or its cause was not known or reasonably knowable. *Fine v. Checcio, D.D.S.*, 582 Pa. 253, 870 A.2d 850 (2005). The discovery rule can toll the statute of limitations until a plaintiff could reasonably discover the cause of his injury in cases where the connection between the injury and the conduct of another is not apparent. *Wilson v. El-Daief*, 600 Pa. 161, 964 A.2d 354 (2009).

If the injured party could not ascertain he was injured and by what cause within the limitations period, "despite the exercise of reasonable diligence," then the discovery rule is appropriate. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983). The test is objective but takes into account individual capacities and society's expectations of "attention, knowledge, intelligence and judgment" for citizens to protect their own interests. *Fine*, *supra* at 858. The party who invokes the discovery rule has the burden of proving its applicability by establishing he acted with reasonable diligence in determining the fact and cause of his injury but he was unable to ascertain it. *Weik v. Estate of Brown*, 794 A.2d 907, 909 (Pa. Super. 2002). Thus, the key point that gives rise to application of the discovery rule "is the inability of the injured party, despite the exercise of reasonable diligence, to know that he has been injured and by what cause." *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. 2005) (citing *Fine*, *supra* at 858).

This determination is a factual one as to whether the party, despite the exercise of reasonable diligence, was unaware of his injury and unable to determine its cause. *Id*. Where the rule's application involves a factual determination regarding whether the plaintiff exercised due diligence in discovering his injury, the jury must decide whether the rule applies. *Crouse v. Cyclops Industries*, 560 Pa. 394, 745 A.2d 606 (2000).

*Simon v. Wyeth Pharm., Inc.*, 989 A.2d 356, 365–366 (Pa. Super. 2009).

The discovery rule "originated in cases in which the injury or its cause was neither known nor reasonably knowable." *Lewey v. H.C. Frick Coke Co.*, 31 A. 261 (Pa. 1895). The purpose of the discovery rule is to exclude from the running of the statute of limitations that period during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992).

*Fine v. Checcio*, 870 A.2d 850 (Pa. 2005), is the seminal case on the discovery rule. The *Fine* Court held that "it is not relevant to the discovery rule's application whether or not the prescribed period has expired; the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id*. at 859. Once a defendant raises the statute of limitations as an affirmative defense in new matter, however, it is then the plaintiff's obligation to present facts

indicating that the discovery rule is applicable. **Stein v. Richardson**, 448 A.2d 558 (Pa. Super. 1982).

Our Supreme Court has written extensively on this issue, and we turn to the High Court for guidance in our disposition.

Pennsylvania's formulation of the discovery rule reflects a narrow approach "to determining accrual for limitations purposes" and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions. **Wilson v. El–Daief**, **supra** at 364. . . . The discovery rule operates to balance the rights of diligent, injured plaintiffs against the interests of defendants in being free from stale claims, in furtherance of salient legislative objectives. **Id**. at 366 n.12. . . .

[I]t is not relevant to the application of the discovery rule whether the prescribed statutory period has expired. **Fine**, **supra** at 859. The discovery rule applies to toll the statute of limitations in any case in which a party is reasonably unaware of his or her injury at the time his or her cause of action accrued. **Id**. . . . Only where the facts are so clear that reasonable minds could not differ may a court determine as a matter of law at the summary judgment stage, the point at which a party should have been reasonably aware of his or her injury and its cause and thereby fix the commencement date of the limitations period. **Id**.

The *sine qua non* of the factual inquiry into the applicability of the discovery rule in any given case is the determination whether, during the limitations period, the plaintiff was able, through the exercise of reasonable diligence, to know that he or she had been injured and by what cause. In this context, we have clarified that reasonable diligence is not an absolute standard. As we have stated:

"**There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.**"
Put another way, "the question in any given case is

not, what did the plaintiff know of the injury done him? But, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?" While reasonable diligence is an objective test, "it is sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." Under this test, a party's actions are evaluated to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others."

Therefore, when a court is presented with the assertion of the discovery rule's application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. . . . **Where . . . reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.**

*Fine*, *supra*, at 858–859 (citations and quotations omitted) (emphasis added).

Nevertheless, the party asserting application of the discovery rule bears the burden of proof, *Wilson*, *supra* at 362, and Pennsylvania courts have not hesitated, where appropriate, to find as a matter of law that a party has not used reasonable diligence in ascertaining his or her injury and its cause, thus barring the party from asserting his or her claim under the discovery rule. *Cochran v. GAF Corp.*, 542 Pa. 210, 666 A.2d 245, 248 (1995).

*Gleason*, 15 A.3d at 484–486 (initial emphasis in original; second emphasis added).

- 12 -

In considering the relevant statute of limitations and the potential applicability of the discovery rule, the trial court stated as follows:

> The allegations of negligence by [Appellees] resulting in injury to Mrs. Nicolaou would have occurred during [Appellees'] care of Mrs. Nicolaou between 2001 and 2008. [The Nicolaous] initiated this lawsuit by way of complaint that was filed on February 10, 2012. Therefore, the prescribed statutory period expired and [the Nicolaous] are barred from bringing suit unless the discovery rule barred the running of the statute of limitations until sometime on or after February 10, 2010.
>
> * * *
>
> In this case, we find the evidence supports the conclusion that the commencement of the statute of limitations period began prior to February 10, 2010, and that such evidence is so clear that reasonable minds could not differ regarding that fact.

Trial Court Opinion, 2/24/14, at 9.

The basis for the Nicolaous' argument is that until Mrs. Nicolaous had confirmation of lyme disease from the IGeneX test, there was no "basis for a lawsuit." The Nicolaous' Brief at 17. Mrs. Nicolaou therefore maintains that because she was unable to afford the cost of the test until February 1, 2010, and thus did not receive confirmation of lyme disease until February 13, 2010, the trial court "erred in holding that reasonable minds could not differ as to whether Mrs. Nicolaou exercised reasonable diligence . . . ." *Id*. at 18. The Nicolaous posit:

> The facts presented, taken in a light most favorable to [the Nicolaous] establish that Mrs. Nicolaou could not afford testing needed to confirm the diagnosis and that while she may have suspected she had Lyme Disease, it had not been confirmed and **she didn't believe it**. Therefore, a genuine issue of material fact exists as to whether reasonable minds differ as to the

- 13 -

knowledge and beliefs of [the Nicolaous] such that summary judgment was improper.

The Nicolaous' Brief at 20 (emphasis added). Our review of the record compels our disagreement.

Mrs. Nicolaou's Facebook post, indeed her own words, bear on the fallacy of her claim on appeal that "she didn't believe it." As underscored by the trial court, on February 14, 2010, Mrs. Nicolaou posted, "I had been telling everyone for years i thought it was lyme . . . .," to which one of her Facebook friends responded, "[Y]ou DID say you had Lyme so many times!" Trial Court Opinion, 2/24/14, at 5; Memorandum of Law of Appellees in Support of Summary Judgment, 12/6/13, at Exhibit F.

It is necessary, then, to examine the propriety of the trial court's determination that "the evidence supports the conclusion that the commencement of the statute of limitations period began prior to February 10, 2010," which is two years before the Nicolaous filed their complaint against Appellees on February 10, 2012. We have noted previously that the party who invokes the discovery rule, Mrs. Nicolaous herein, has the burden of proving its applicability and must do so by establishing that she acted "with reasonable diligence in determining the fact and cause of [her] injury but [s]he was unable to ascertain it." *Weik*, 794 A.2d at 909.

Allegations of the complaint and Mrs. Nicolaou's deposition testimony[6] proffer that she admittedly sought medical care in 2001 when she began experiencing symptoms that she attributed to a tick bite, including a rash at the site of the bite, numbness and tingling in her extremities, and back pain. Second Amended Complaint, 5/31/12, at 6. She treated with various Appellees for multiple sclerosis ("MS"), despite suspecting that she suffered from lyme disease. *Id*. at 7–9. Rita Rhoads, the nurse practitioner who ultimately diagnosed Mrs. Nicolaou with lyme disease, testified that when Mrs. Nicolaou first came to her on July 20, 2009, Mrs. Nicolaou told her she had a "[d]iagnosis of [MS] but was told [she] may have lyme." Deposition of Rita Rhoads, 11/1/13, at 13. Further, a brain MRI[7] conducted on July 3,

_____

[6] We note that the certified record contains only portions of Mrs. Nicolaou's November 6, 2013 deposition. Through our efforts to obtain the complete deposition, the trial court communicated that "[n]either party made Ms. Nicolaou's entire deposition a matter of record. . . .Therefore, the trial court was bound by the undisputed facts in the Motion for Summary Judgment." **But see Commonwealth v. Barnett**, 121 A.3d 534, 546 (Pa. Super. 2015), *appeal denied*, 128 A.3d 1204 (Pa. 2015), *cert. denied sub nom.*, **Barnett v. Pennsylvania**, ___ U.S. ___, 136 S.Ct. 2391 (2016) (where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it) (citing **Commonwealth v. Brown**, 52 A.3d 1139, 1145 n.4 (Pa. 2012)). In **Barnett**, as here, the reproduced record contained the relevant missing transcripts, and there was no dispute as to their contents. Due to the procedural posture of the instant case, however, we have utilized only those portions of the deposition that are in the certified record.

[7] "MRI, or magnetic resonance imaging, is a type of diagnostic radiography used to make images of tissues and organs of the human body. Taber's Cyclopedic Medical Dictionary 1230 (19th ed. 2001)." **Northeastern**
*(Footnote Continued Next Page)*

2006, indicated findings "seen in infectious or inflammatory demyelinating process, such as [MS] or Lyme Disease . . . ." Second Amended Complaint, 5/31/12, at 7; Deposition of Rita Rhoads, 11/1/13, at 40.

It is striking and convincing of the correctness of the result below that Mrs. Nicolaou's symptoms dramatically improved upon treatment for lyme disease, which was months before the positive blood test on February 1, 2010. Mrs. Nicolaou admittedly has suffered significant maladies. She lost control of bowels and bladder, she eventually became confined to a wheelchair, and she experienced systemic pain, numbness, and tingling. Second Amended Complaint, 5/31/12, at 9. Mrs. Nicolaou eventually began treating with nurse practitioner, Rita Rhoads. *Id*. at 10.

Ms. Rhoads is a certified nurse practitioner with a master's degree in public health from Johns Hopkins University. Deposition of Rita Rhoads, 11/1/13, at 8. She also is a member of ILADS, the International Lyme and Associated Disease Society. *Id*. at 9. Ms. Rhoads first saw Mrs. Nicolaou on July 20, 2009, which was nearly seven months **before** Mrs. Nicolaou received the lyme-positive test. Ms. Rhoads stated that at that point, she believed Mrs. Nicolaou had "[p]robable lyme . . . resulting in [MS]." Appellees' counsel asked Ms. Rhoads, "Did you discuss this with Ms. Nicolaou and **tell her that at this point**, based upon the history that you had taken,

*(Footnote Continued)* ─────────────

***Pennsylvania Imaging Ctr. v. Commonwealth of Pennsylvania***, 35 A.3d 752, 753 n.1 (Pa. 2011).

- 16 -

your examination, and everything she told you, that you thought she may have lyme disease?" *Id*. at 25. Ms. Rhoads responded, "Correct." *Id*. Based on that belief, on July 20, 2009, Ms. Rhoads prescribed, *inter alia*, Minocycline to treat the lyme disease. *Id*. at 25–26. Ms. Rhoads reiterated that she told Mrs. Nicolaou on July 20, 2009, that Ms. Rhoads was prescribing the antibiotic for **lyme disease**. *Id*. at 26. In fact, Mrs. Nicolaou's testimony confirmed that Ms. Rhoads told her she thought Mrs. Nicolaou had lyme disease and was prescribing Minocycline to treat it. Deposition of Nancy Nicolaou, 11/6/13, at 61. Ms. Rhoads described Mrs. Nicolaou's improvement upon treatment with the antibiotic as "absolutely amazing," as of September 21, 2009, lending significant reliability to Ms. Rhoads' lyme-disease diagnosis. Deposition of Rita Rhoads, 11/1/13, at 31, 32. Indeed, Mrs. Nicolaou testified that her "bladder and bowel had went [sic] back to normal the first month of treatment" for lyme disease. Deposition of Nancy Nicolaou, 11/6/13, at 67.

Most significantly, the record reveals that on July 20, 2009, Ms. Rhoads prescribed a different test for lyme disease, IGeneX, than the prior tests administered by Appellees. Mrs. Nicolaou, however, declined to take the test at that time. Deposition of Rita Rhoads, 11/1/13, at 29. Ms. Rhoads explained the significance of the test, as follows:

> Many years ago, and I don't know the exact date, I would say 15, 20 years ago, the government decided that the lyme epidemic was rising and they needed a vaccine for lyme.

So they analyzed the lyme bacteria and said if we are going to build a vaccine, what vaccine is going to be the most effective against lyme? When they did the analysis, they discovered the tail of the lyme organism—it's a spirochete, so it has a tail.

The tail of the lyme spirochete had two DNA bands on it, 31 and 34, that were very different from most organisms. So they said we will build our vaccine around 31 and 34. Therefore, we're going to take 31 and 34 out of all of the lyme testing because everybody's going to get the vaccine and everybody's going to be positive for 31 and 34. Therefore, if they're positive for 31 and 34, it only means they had the vaccine, not that they have lyme.

Okay. Well, they developed the vaccine LYMErix which was a huge disaster. A lot of people got significant lyme symptoms for the LYMErix, and it was taken off the market. . . .

So when the CDC took the vaccine off the market, they didn't say, oh, we failed; we're going to have the labs put 31 and 34 back in the [test]. So therefore Quest, Health Network, LabCorp, none of them have bands 31 and 34 in their testing.

So we look for labs that do have 31 and 34 in the testing so that we can get complete bands. So for the majority of people, we use IGeneX in California. . . .

\* \* \*

Q. And did you discuss with Ms. Nicolaou what you just laid out with me here today?

A. Yes. Yes.

Q. You had that discussion with her in July?

A. Yes.

Deposition of Rita Rhoads, 11/1/13, at 27–29.

Ms. Rhoads stated that Mrs. Nicolaou "just didn't have the money for anything." Deposition of Rita Rhoads, 11/1/13, at 29. Counsel inquired:

Q. So other than the financial reason, there was no reason she couldn't have had the test at that point, correct?

A. Correct.

Q. She wasn't on a drug that would have prevented this test—

A. No.

Q. —from being performed?

A. No.

*Id*. at 29–30.

Mrs. Nicolaou corrected counsel's suggestion that she "lost" her health insurance in 2005. Deposition of Nancy Nicolaou, 11/6/13, at 34. Mrs. Nicolaou stated, "I didn't lose it." *Id*. Counsel continued as follows:

Q. What happened?

A. I stopped paying for it.

Q. Why did you stop paying for your health insurance?

A. Because they refused paying for any of the tests that the doctors had ordered.

* * *

Q. [S]o you decided to just voluntarily stop paying for health insurance?

A. Correct.

Q. And then you became what is referred to as a self-pay?

A. Correct.

Q. So you knew that from that point forward any tests you wanted run you would have to pay for out of your own pocket, correct?

A. That's correct.

*Id*. at 34–35.

It is without question, then, that as early as July 20, 2009, Ms. Rhoads informed Mrs. Nicolaou that Ms. Rhoads believed Mrs. Nicolaou had lyme disease, Ms. Rhoads, in fact, treated Mrs. Nicolaou for lyme disease, the treatment caused "amazing" improvement in Mrs. Nicolaou's symptoms, and Mrs. Nicolaou knew of the availability of an objective test that could confirm Ms. Rhoads' clinical diagnosis. Moreover, for the ensuing **seven months**, Mrs. Nicolaou refused to obtain the objective proof of the clinical diagnosis Ms. Rhoads had rendered.[8]

As our Supreme Court has expressed, the greater burden placed upon Pennsylvania plaintiffs *vis-á-vis* the discovery rule, "is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of

---

[8] Contrary to the suggestion of the Dissent, Dissenting Opinion at 3, there is nothing in the record confirming that Mrs. Nicolaous was **unable** to pay for the IGeneX test when Ms. Rhoads ordered it on July 20, 2009, only that Mrs. Nicolaous chose not to do so. Mrs. Nicolaous had clarified that she voluntarily stopped paying for her health insurance because she was annoyed that it did not cover tests being ordered for her in 2005. Deposition of Nancy Nicolaou, 11/6/13, at 34. Mrs. Nicolaou further acknowledged that her decision cast her into a category of self-pay individuals. *Id*. at 35. Most telling, Mrs. Nicolaous testified that Ms. Rhoads had recommended IGeneX but "she wanted to see how the antibiotics were going to react to my symptoms," *id*. at 75, thereby indicating a conscious decision not to obtain the test, not an inability to afford it. Thus, review of the record does not suggest that Mrs. Nicolaou could not afford the test, but that she chose not to partake at that time.

the full extent of the injury, the fact of actual negligence, or precise cause.'"

*Gleason*, 15 A.3d at 484–485. The *Gleason* Court reminds us that the *sine qua non* of the factual inquiry into the applicability of the discovery rule in any given case "is the determination whether, during the limitations period, the plaintiff was able, through the exercise of reasonable diligence," to know that he had been injured and by what cause. *Id*. at 485. Reasonable minds would not differ that Mrs. Nicolaou should have known as early as July 2009, and **could have proven** at that time, that she suffered from lyme disease.

Moreover, the standard of reasonable diligence was not met herein. The question before us is not what the Nicolaous knew of the injury, but rather, what might the Nicolaous have known, "by the use of the means of information within [their] reach, with the vigilance the law requires of [them]?" *Gleason*, 15 A.3d at 485.

Our review of the record, in the light most favorable to the Nicolaous, the non-moving party, compels our conclusion that Mrs. Nicolaou knew, or reasonably should have known, between July and September, 2009, that her long-standing health problems may have been caused by Appellees' failure to diagnose and treat her lyme disease and therefore, such failure could have resulted from Appellees' negligence. Because we find that reasonable minds could not differ in this conclusion, and thus, there are no genuine issues of material fact, the trial court's entry of summary judgment was proper.

Order of February 24, 2014, affirmed.

P.J.E. Ford Elliott, P.J.E. Bender, and Judges Panella, Olson, and Ott join this Opinion.

Judge Lazarus files a Dissenting Opinion in which P.J. Gantman and Judge Bowes join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/22/2016